Anna WILLIAMS b/n/f Randy Williams and Kelly Williams, and Randy Williams and Kelly Williams, Individually, Appellants–Plaintiffs,

v.

M. Jayme ADELSPERGER, D.D.S., Appellee–Defendant.

No. 49A05–0905–CV–260.

Court of Appeals of Indiana.

Dec. 22, 2009.

Neal F. Eggeson, Jr., Eggeson Appellate Services, Indianapolis, IN, Attorney for Appellant.

John M. McCrum, Mallory Reider Inselberg, Eichhorn & Eichhorn, LLP, Indianapolis, IN, Attorneys for Appellee.

## OPINION

MAY, Judge.

 Anna Williams brought a medical malpractice action against Dr. Jayme Adelsperger ("the Doctor"). The Doctor moved for summary judgment based on the statute of limitations for medical malpractice, because more than two years passed between August 29, 2002—the last date the Doctor treated Williams—and December 2, 2004, the date Williams filed her claim. The trial court granted the Doctor's motion. As the record reflects Williams had, by September 2003 at the latest, discovered facts that in the exercise of reasonable diligence should have led to the discovery of any medical malpractice and resulting injury, we affirm.[1]

## FACTS AND PROCEDURAL HISTORY[2]

Williams brought her action under the Indiana Medical Malpractice Act, Ind.Code § 34–18–1–1 et seq., alleging the Doctor failed to diagnose temporomandibular joint dysfunction ("TMJ") in treating Williams, causing Williams pain and suffering and permanent injuries.

Williams, then ten years old, first saw the Doctor in June of 1999 after she was told she needed braces. The Doctor believed Williams's temporomandibular joints were "asymptomatic, functioning within normal limits." (App. at 86.) Williams began orthodontic treatment with the Doctor. By July 2001 she began experiencing pain when she opened her mouth wide. The Doctor prescribed pain medicine, and when the pain continued the Doctor indicated the pain was related to the development of wisdom teeth.

X-rays taken in December 2001 showed

---

1. As we affirm on this ground, we need not address Williams's alternative argument the statute of limitations was tolled by the Doctor's fraudulent concealment of her malpractice. The doctrine of fraudulent concealment is an equitable remedy that operates to bar a defendant from asserting the statute of limitations as a defense. Garneau v. Bush, 838 N.E.2d 1134, 1142 (Ind.Ct.App.2005), trans. denied 855 N.E.2d 1004 (Ind.2006). Under this doctrine, a defendant who has prevented a plaintiff from discovering an otherwise valid claim, by violation of duty or deception, is estopped from raising a statute of limitations defense. Id. To successfully invoke the doctrine of fraudulent concealment, a plaintiff must establish the Doctor's concealment of material information somehow prevented her from inquiring into or investigating her condition, thus preventing her from discovering a potential cause of action. Id. at 1143. As explained below, Williams was able to, and did, inquire into and investigate her condition within the limitations period.

2. We heard oral argument on November 17, 2009 at Saint Mary–of–the–Woods College as part of the twenty-fifth anniversary of its Law Day program. We thank the College for its hospitality and commend counsel on the quality of their oral advocacy.

condyle[3] flattening, a preliminary indicator of TMJ, but the Doctor continued treatment with braces. In May of 2002, Williams experienced pain and associated "clicking and popping" in both jaws. (*Id.* at 89.) Clicking and popping are indicators of internal dislocation of the temporomandibular joint. In July 2002, Williams returned to the Doctor with more clicking and popping complaints and a locking sensation. The Doctor "suspected" temporomandibular malfunction, and employed what she characterized as "conservative methods" to treat the problem. (*Id.* at 32.) These included a soft mouth guard and a repositioning splint.[4] She did not refer Williams to a TMJ specialist, but asked Williams if she was grinding her teeth, and instructed her to take painkillers.

In August 2002, the Doctor told Williams's mother that Williams had a muscle problem, not a joint problem, and "implied" Williams was exaggerating her complaints. (*Id.* at 231.) Williams characterizes that office visit as the last time the Doctor treated Williams, but two days later Williams experienced jaw pain while running, eating, and yawning. The Doctor recommended she continue wearing the splint. Three days after that, as Williams's symptoms worsened, the Doctor referred Williams to Dr. Heidi Crow.[5]

The Doctor told Dr. Crow she did not think Williams's problems were TMJ related, but instead might be a "whiplash type injury." (*Id.* at 91.) Dr. Crow adjusted Williams's splint and prescribed muscle relaxants, and when that did not help, she told the family the symptoms were psychosomatic, or Williams might have lupus, but she did not have TMJ.[6] Williams's family disagreed with that diagnosis, and in Octo-

---

3. A condyle is a rounded articular surface at the extremity of a bone. http://www.medilexicon.com/medicaldictionary.php?t=19714 (last visited November 2, 2009).

4. Another dentist who treated Williams between 2002 and 2005 said in his affidavit soft mouth guards "are known to exacerbate many types of [TMJ]." (App. at 80.)

5. In her statement of facts, Williams describes Dr. Crow as the Doctor's "colleague and former teacher" (Appellants' Br. at 4) and asserts the Doctor made the referral "[i]n the hopes of confirming that [Williams] was *not* suffering from TMJ dysfunction...." (*Id.* at 5.) She does not offer citation to the record to support this characterization of Dr. Crow's relationship to the Doctor or the Doctor's motives for the referral, and we accordingly agree with the Doctor that this is inappropriate argument.

Williams asserts, without citation to the record, that the Doctor "explicitly noted TMJ symptoms," but "*still* chose not to refer [Williams] to a specialist." (*Id.* at 4) (emphasis in original). The Doctor, in her brief, describes Dr. Crow as a dentist "specializing in the treatment of TMJ dysfunction." (Br. of Appellee, M. Jayme Adelsperger, D.D.S. (hereinafter "Br. of Appellee") at 4.) She offers no

citation to the record to support that characterization.

6. Williams's mother stated Dr. Crow "told us that Anna definitely was not suffering from TMJ syndrome," (App. at 232), and describes both the Doctor and Dr. Crow as "adamant that Anna was not suffering from TMJ problems." (*Id.* at 233.) In a letter referring Williams to Riley Hospital, Dr. Crow said her "impression was of myofascial pain and TMJ arthralgia." Arthralgia is "pain in one or more joints," htt p://www.merriam-webster.com/dictionary/arthralgias (last visited November 23, 2009), so the Doctor's reference was apparently to Williams's symptoms and not a diagnosis that TMJ syndrome was or was not the cause of the pain. Nothing in that letter suggests Anna "definitely was not" suffering from TMJ syndrome. Dr. Crow expressed her concern about "our inability to provide any reduction in her symptoms with conventional, reversible TMD therapy," (App. at 186), and she noted she was "unsure whether [Williams's] facial and upper torso pain complaints are related." (*Id.*) Dr. Crow suggested Williams "be evaluated for generalized musculoskeletal disorders prior to further intervention regarding her facial pain." (*Id.*)

ber 2002 sought treatment from Dr. Amy Liu at Pain Management Specialists of Indianapolis.

Dr. Liu concluded Williams suffered from several conditions, including TMJ. She referred Williams to a TMJ specialist, but when Williams's mother contacted the Doctor to discuss Dr. Liu's diagnosis, the Doctor again assured Williams's mother Williams did not have TMJ and advised her not to go to the specialist because the specialist was "money hungry." (*Id.* at 233.) Williams's mother got a second referral from Dr. Liu, but the Doctor said that specialist was "not the right person" to treat Williams. Williams never saw either of the TMJ specialists. In a response to an interrogatory, Williams's parents said Williams's symptoms "continually deteriorated under Dr. Adelsperger's care . . . ." (*Id.* at 38.)

In December 2002, on the advice of a friend, Williams's family took her to orthodontists Anoop Sondhi and Jeffrey Biggs, who put Williams on splint therapy. Where the intake questionnaire asked why the consultation was sought, Williams's mother wrote "Referral—prior insufficient care." (*Id.* at 241.) Where it asked "Has patient ever been treated for this problem before?" she wrote "Suspected TMJ—splints made—exasperated [sic] problem." (*Id.*) By July 2003, Doctors Sondhi and Biggs decided Williams had obtained maximum benefit from the orthotic treatment and suggested an MRI. The results led them to refer Williams to Dr. Buttram of Indiana Oral and Maxillofacial Surgery Associates. He concluded Williams had a number of conditions including TMJ, and he performed two surgeries. By February 2005, Williams's braces had been removed and her pain was gone.

Because the MRI revealed temporomandibular joint damage, Williams's father met with the Doctor in September of 2003, and the Doctor told him her treatment had been appropriate and she had met the standard of care in treating Williams.[7] Williams's father suspected the Doctor had been negligent, and he asked the Indiana Dental Association to review the case. On the grievance form Williams's mother noted Williams's symptoms and asked whether those problems would have worsened, as they did, had the Doctor taken other actions. The Dental Association asked Williams's parents to allow an examination by one of its orthodontists, but the parents declined to allow the examination because the Association could not "accommodate [their] request" to have the exam done by someone "with TMJ experience." (*Id.* at 41.)

The Association concluded its review in December 2003 and did not find the Doctor negligent. The family then brought this case before the Department of Insurance in December 2004. The medical review panel found the Doctor met the applicable standard of care, and then Williams brought her complaint for damages in the Marion Superior Court. That court found there was no issue of fact as to the running of the statute of limitations and granted summary judgment for the Doctor.

### DISCUSSION AND DECISION

■ Summary judgment is a procedural means to halt litigation when there are no factual disputes and to allow the case to be determined as a matter of law. *Garneau v. Bush*, 838 N.E.2d 1134, 1140 (Ind.Ct.

---

7. In October 2003, a manager for Williams's father's employee benefits account wrote to the insurer about coverage and asked, "If the TMJ condition is a result of the braces and treatment performed by Dr. Adelsperger, does the plan provide any benefits?" (App. at 275.) At the bottom of the letter is an indication a copy was sent to Williams's parents.

App.2005), *trans. denied* 855 N.E.2d 1004 (Ind.2006). Under Indiana Trial Rule 56, the moving party bears the burden to show there are no genuine issues of material fact. If the moving party meets its burden, the burden shifts to the non-moving party to set forth facts showing the existence of a genuine issue for trial. *Id.* Summary judgment is appropriate only if there is no genuine issue of material fact for trial and the moving party is entitled to judgment as a matter of law. *Id.* It is inappropriate if any material facts are in dispute or if undisputed facts could lead to conflicting material inferences. *Id.*

■ When the moving party asserts the statute of limitations as an affirmative defense and establishes that the action was commenced outside the statutory period, the burden shifts to the non-moving party to establish an issue of fact material to a theory that avoids the affirmative defense. *Id.* Any doubt as to a fact or an inference to be drawn is resolved in favor of the non-moving party, *Poznanski ex rel. Poznanski v. Horvath*, 788 N.E.2d 1255, 1258 (Ind.2003), so in determining the discovery date of medical malpractice, we construe all facts in favor of Williams as the non-movant. *See Garneau*, 838 N.E.2d at 1141.

■ The statute of limitations for Williams's medical malpractice claim is Ind.Code § 34–18–7–1(b):

> A claim, whether in contract or tort, may not be brought against a health care provider based upon professional services or health care that was provided or that should have been provided

unless the claim is filed within two (2) years after the date of the alleged act, omission, or neglect. . . .

This occurrence-based statute of limitations is constitutional when applied to plaintiffs who are able to discover the alleged malpractice and injury within two years from the occurrence. *Ling v. Webb*, 834 N.E.2d 1137, 1141 (Ind.Ct.App.2005).

■ A medical malpractice action may not be brought against a health care provider until the claimant's proposed complaint has been filed with the Department of Insurance and an opinion has been issued by a medical review panel. Ind.Code § 34–18–8–4; *see Putnam County Hosp. v. Sells*, 619 N.E.2d 968, 970 (Ind.Ct.App. 1993) (submission of a proposed complaint to the medical review panel is a condition precedent to filing a medical malpractice claim). The failure to file a proposed complaint with the Department of Insurance within two years is ordinarily fatal to a claimant's medical malpractice lawsuit. *Ling*, 834 N.E.2d at 1141. The Doctor last treated Williams in August of 2002. Williams filed her complaint with the Department of Insurance in December of 2004.

■ The question of when a plaintiff discovers facts that, in the exercise of reasonable diligence, should lead to the discovery of medical malpractice and resulting injury, is often one of fact. *Van Dusen v. Stotts*, 712 N.E.2d 491, 499 (Ind.1999). A plaintiff's "lay suspicion" that there may have been malpractice is generally not sufficient to trigger the two-year period.[8] *Id.*

---

8. Our Supreme Court recently addressed the nature and significance of the "trigger date" in *Overton v. Grillo*, 896 N.E.2d 499, 502 (Ind.2008), *reh'g denied*. It noted a complaint must be filed within two years after the alleged negligent act or omission:

> However, the date on which the limitations period is activated—the "trigger date"—. . . may in certain circumstances be deferred. A plaintiff who cannot reasonably know of the alleged malpractice within the two-year period may institute a claim for relief within two years from the trigger date. If a

At the same time, a plaintiff need not know with certainty that malpractice caused his injury to trigger the running of the statutory time period. *Id.* When it is undisputed that a plaintiff's doctor has expressly informed a plaintiff that he has a specific injury and that there is a reasonable possibility, if not a probability, that the specific injury was caused by a specific act at a specific time, then the question may become one of law. *Id.* Under those circumstances, a plaintiff is generally deemed to have sufficient facts to require him to seek promptly any additional medical or legal advice needed to resolve any remaining uncertainty or confusion he may have regarding the cause of his injury and any legal recourse he may have. *Id.* His unexplained failure to do so does not excuse a failure to timely file a claim. *Id.*

In *Van Dusen,* the plaintiff Stotts's urologist, Dr. Allen, performed a biopsy on Stotts's tumor. In July of 1992, Dr. Van Dusen reported the tumor was not cancerous. Around Thanksgiving of 1994, Stotts underwent more testing, and in January of 1995, Dr. Allen told Stotts he had incurable prostate cancer and the 1992 biopsy might have been misread. The Court determined the limitations period was triggered in January of 1995, when Dr. Allen told Stotts the 1992 biopsy may have been improperly read.

> Prior to being so informed, plaintiffs reasonably assumed that the biopsy slides were properly read in 1992 and simply did not show a malignancy. Once Dr. Allen informed Stotts that he had prostate cancer that had advanced to the point that it was not curable and that it was possible that the biopsy of the tumor was misread, however, plaintiffs were armed with sufficient information to enable them to press Dr. Allen to arrange for the 1992 biopsy slides to be reread or to seek other medical and legal advice. Therefore, it was in January of 1995 that plaintiffs discovered facts which, in the exercise of reasonable diligence, should have lead [sic] to the discovery of the malpractice.

*Id.* at 500. The Stottses' complaints were filed in April and July of 1996, so they were timely.

Similarly, in *Shah v. Harris,* 758 N.E.2d 953, 958 (Ind.Ct.App.2001), *reh'g denied, trans. denied* 774 N.E.2d 515 (Ind.2002), Dr. Shah diagnosed Harris with multiple sclerosis in July 1991. Harris' last visit with Dr. Shah was in April 1993. Harris remained under the care of other physicians in the following years under the belief that he had multiple sclerosis. In July 1998, his illness was correctly diagnosed as a vitamin B–12 deficiency, not multiple sclerosis. Harris received that diagnosis seven years after Dr. Shah's diagnosis and five years after the physician-patient relationship ended. We noted Harris had "no information that, in the exercise of reasonable diligence, should have led to the discovery of the alleged malpractice ... during the statutory period." *Id.* (quoting *Van Dusen,* 712 N.E.2d at 493).

The specific malpractice Williams alleges is the Doctor's failure to diagnose TMJ. Williams had ample information during the

---

trigger date occurs before the expiration of the limitations period, the plaintiff's claim will be barred unless filing before the expiration of the two-year period was not possible with reasonable diligence. In any event the complaint must be filed within a reasonable period after the trigger date. The trigger date, whether before or after the expiration of the limitations period, is the point at which the plaintiff either knows of malpractice or "learns of facts that, in the exercise of reasonable diligence, should lead to the discovery of the malpractice and the resulting injury."
(Citations omitted.)

limitations period that, in the exercise of reasonable diligence, should have led to the discovery of the malpractice she alleges. Williams concedes her parents "*suspected* malpractice" in September 2003, but it was not until February 2005[9] that they "first *discovered facts* which would alert a reasonable person" to the Doctor's malpractice. (Appellants' Br. at 12.) Williams argues she did not have the "kind of knowledge or understanding" of her condition, (*id.* at 18), to recognize malpractice before February 14, 2005, the date Dr. Sondhi "agreed that [Williams's] TMJ problem began while under the Doctor Adelsperger's care and that [the Doctor] should have diagnosed the problem and referred [Williams] for TMJ treatment." (App. at 234.)

Unlike Stotts's tumor, Williams's disorder was not latent—the symptoms were obvious and Williams's parents knew they had worsened under the Doctor's care. Nor was Williams without a correct diagnosis until after the limitations period had run, as was Harris. By October of 2002, Dr. Liu had diagnosed TMJ. In July 2003, Doctors Sondhi and Biggs noted they had begun orthotic therapy in an effort to resolve Williams's "symptoms of clicking and pain in the right and left temporomandibular joints." (*Id.* at 116.) They noted there had been some improvement, but it was "unlikely that continuation of orthotic therapy beyond this point will result in any further improvement." (*Id.*) In September 2003, about a year after Williams's last treatment by the Doctor, Dr. Buttram told Williams's parents she had, among other conditions, TMJ.

Williams brought her action too late, even though no doctor had explicitly indicated there had been malpractice, because the trigger to action may occur when symptoms develop or worsen during or after a medical treatment and accordingly put a plaintiff on notice of potential mistreatment or improper care. In *Levy v. Newell*, 822 N.E.2d 234 (Ind.Ct.App.2005), *trans. denied* 841 N.E.2d 176 (Ind.2005), Newell contended she could not discover the alleged malpractice until medical personnel had reviewed her medical records. We noted discovery may occur before a physician or other medical expert gives a definitive opinion regarding the alleged act of malpractice. *Id.* at 238. Newell's surgery, where the alleged malpractice occurred, was in April of 2001. We noted Newell may not have had "actual discovery based on a physician's opinion" until February of 2003, but she had information almost two years earlier that would have led a reasonable person to believe her doctor committed malpractice. *Id.*

Within three days of her surgery, Newell began having indications something was wrong. A week after surgery, a diagnostic test revealed a duct injury secondary to the surgery. The next day Newell was admitted to a hospital for evaluation and surgical repair of the injury. In August 2001, four months after the injury was discovered, and some twenty months before the expiration of the statute of limitation, Newell consulted an attorney. Eighteen months before the expiration of the limitation period, in October of 2001, Newell asked her attorney to write the letter referring to her belief the doctor had committed malpractice.

We held as a matter of law that Newell had sufficient knowledge by October of 2001, if not sooner, to put a reasonable person on notice that malpractice had

---

9. This asserted "discovery" date is some two months *after* Williams brought the malpractice complaint. That is, Williams appears to be arguing she filed her complaint before she had sufficient knowledge to do so.

caused her injury. That left Newell with over fourteen months in which to file a malpractice suit, so enforcement of the two-year occurrence-based statute of limitation "neither denied the Newells a meaningful opportunity to pursue their malpractice claims nor shortened the window of time between discovery and the expiration of the limitation period so unreasonably that it was impractical for them to file their claim." *Id.* at 239.

Similarly, Williams believed early on that the Doctor's treatment had caused or exacerbated her condition. One doctor had diagnosed TMJ about two months after Williams' last treatment by the Doctor, and another diagnosed TMJ less than a year after that, when about eleven months remained in the limitations period. Williams had sufficient information and time within which to bring her claim. We cannot say summary judgment for the Doctor was error, and we accordingly affirm.

Affirmed.

BAILEY, J., and VAIDIK, J., concur.