The FIRST BANK OF WHITING n/k/a
Centier Bank, Appellant–Cross–
Appellee–Defendant,

v.

Thomas SCHUYLER, Appellee–
Cross–Appellant–Plaintiff.

No. 56A03–9705–CV–142.

Court of Appeals of Indiana.

March 26, 1998.

Karl L. Mulvaney, Nana Quay–Smith, Candace L. Sage, Bingham Summers Welsh & Spilman, Indianapolis, David M. Austgen, Austgen & Decker, Crown Point, for Appellant–Cross–Appellee–Defendant.

Eugene M. Feingold, Steven P. Kennedy, Law Offices of Eugene M. Feingold, Munster, R. Steven Ryan, Barce & Ryan, Kentland, for Appellee–Cross–Appellant–Plaintiff.

## OPINION

GARRARD, Judge.

### *STATEMENT OF THE CASE*

Appellant/cross-appellee and defendant below, the First Bank of Whiting n/k/a Centier Bank (the "Bank"), appeals the jury verdict and judgment entered thereon in favor of appellee/cross-appellant and plaintiff below, Thomas Schuyler ("Schuyler"). The jury awarded Schuyler both compensatory and punitive damages for his claims. The trial court subsequently vacated the punitive damage award and granted a new trial solely on that issue. Schuyler cross-appeals the trial court's decision to vacate the punitive damage award and to grant a new trial.

### *FACTS AND PROCEDURAL HISTORY*

The Bank was the primary lender which financed the 1978 initial construction and the development of a building located at 9245 Calumet Avenue in Munster (the "Building"). The primary tenant of the Building was the Dynasty Racquetball Club. In 1979 or 1980, while the Building was being operated as a racquetball club, the Building experienced moisture which came into the lower level through the seams between the concrete walls. The moisture caused relatively minor damage such as slippery floors, condensation, and small pools of water. The moisture problem was resolved by removing the earthen berms around the Building so that a tarry fibrous material could be applied to the seams of the foundation. After the problem was solved, the berms were replaced.

In June of 1981, the Munster area experienced a heavy rainfall which was so substantial as to cause the Little Calumet River to flood over its banks. The Building suffered substantial damage when its storm/sanitary sewers backed up through the floor drains and into the Building. Storm water also came in the Building through the north door, but management was able to stop that water after a very short period of time by using simple barriers. Because management was unable to stop the sewer backup, approximately 12 of the 15 racquetball courts were damaged and had to be replaced. After the flood, management discovered that during construction of the Building the architect had failed to install a check valve designed to prevent water backflow on the sewer line. A check valve was then installed and no other backups were experienced during the Building's operation as a racquetball club. In the years following the 1981 flood, racquetball club members recall viewing evidence of minor seepage and moisture in the Building, the origin of which was unknown. Aside from the minor seepage, the Building experienced no serious water problems after the 1981 flood.

In the Spring of 1985, the Bank foreclosed on the Building, the racquetball facility was closed, and the Building remained vacant until 1987. In 1987, Schuyler, a commercial real estate developer, arranged to tour the Building with the idea of buying the Building and converting it into office space. Before one of Schuyler's visits to the Building, bank employee Herb Southworth had discovered that the carpet in the lower level of the building had become wet and that several of the racquetball floors had become damaged. Southworth investigated the cause of the damage and discovered that a hot water heater had rusted and was leaking in the lower level. Southworth immediately contacted the water department and had the water shut off and had drying crews brought in to dry the carpet. Thereafter, Schuyler met with Southworth to tour the Building. At the time Schuyler toured the Building, he observed the damp carpeting and warped racquetball floors. When Schuyler inquired as to the cause of this visible water damage, Southworth explained to him that the damage was caused by the broken hot water heater. Schuyler made no further inquiries of Southworth about any water problems in the history of the Building. Prior to his purchase of the Building, Schuyler was given blue prints of the entire Building, inspected the Building, and viewed all sump pumps and drains.

In 1988, Schuyler purchased the Building for $550,000.00 and proceeded to remodel the Building for use as office space. Subsequent to its purchase by Schuyler, the Building experienced a number of externally-generated water problems whereby water either

flowed, seeped, or backed-up into the building. Schuyler suffered substantial expense in repairing the damages suffered to the Building and eventually lost the Building to foreclosure.

Thereafter, Schuyler filed his complaint against the Bank alleging that it had committed actual fraud when it sold the Building to him without disclosing the history of water problems experienced at the racquetball facility. Schuyler sought both compensatory and punitive damages for his alleged injuries. The Bank denied Schuyler's allegations and filed a Motion for Summary Judgment which was granted by the trial court. In response to a Motion to Correct Error filed by Schuyler, the trial court reversed its original entry of summary judgment and reinstated Schuyler's claims. The case proceeded to trial by jury. The jury found in Schuyler's favor and awarded Schuyler $223,000.00 in compensatory damages and $800,000.00 in punitive damages. Thereafter, in response to a Motion to Correct Error filed by the Bank, the trial court vacated the punitive damage award and ordered a new trial on that issue. This appeal and cross-appeal ensued.

### ISSUE

Both the Bank and Schuyler present several issues for our review; however, because the Bank presents reversible error on a dispositive issue, we need only address whether the Bank had a duty to disclose the "water history" of the Building to Schuyler.

### DISCUSSION AND DECISION
#### Standard of Review

 The Bank moved for judgment on the evidence in its motion to correct error pursuant to Indiana Trial Rule 50(A)(4). The purpose of a motion for judgment on the evidence is to test the sufficiency of the evidence. *Nesvig v. Town of Porter*, 668 N.E.2d 1276, 1282–83 (Ind.Ct.App.1996). Where all or some of the issues in a case tried before a jury are not supported by sufficient evidence or a verdict thereon is clearly erroneous or contrary to the evidence because the evidence is insufficient to sup-

port it, the court shall withdraw such issues from the jury and enter judgment thereon or shall enter judgment thereon notwithstanding the verdict. Ind.Trial Rule 50(A). On appeal, we apply the same standard as the trial court. We consider the evidence in the light most favorable to the non-moving party and enter judgment on the evidence only if there is no substantial evidence or reasonable inference to be drawn therefrom to support an essential element of the claim. *Town of Highland v. Zerkel*, 659 N.E.2d 1113, 1120 (Ind.Ct.App.1995), *trans. denied.*

### Fraud

 Schuyler brought his claim for compensatory and punitive damages against the Bank alleging that the Bank committed actual fraud when it failed to make a full disclosure of material facts regarding the "water history" of the Building. To sustain an action for fraud, the plaintiff must prove that the defendant made a material misrepresentation of a past or existing fact, which was false, was made with knowledge or in reckless ignorance of the falsity, was relied upon by the complaining party, and proximately caused the complaining party's injury. *Strodtman v. Integrity Builders, Inc.*, 668 N.E.2d 279, 283 (Ind.Ct.App.1996). Moreover, the failure to disclose all material facts by one on whom the law imposes a duty to disclose constitutes actionable fraud. *Fleetwood Corp. v. Mirich*, 404 N.E.2d 38, 42 (Ind.Ct.App.1980).

 Because we are faced with an alleged failure to disclose all material facts, the parties agree that the threshold question is whether the Bank had a duty to disclose. Although the rule of *caveat emptor* as applied to real estate transactions has been relaxed under some circumstances, we continue to recognize that the seller of real estate is not ordinarily bound to disclose any material facts unless there exists a relationship for which the law imposes a duty of disclosure.[1] *Indiana Bank & Trust Co. v. Perry*, 467 N.E.2d 428, 431 (Ind.Ct.App. 1984). However, as we explained in *Perry*,

---

1. We note that the Indiana Code § 24–4.6–2–7 imposes specific disclosure requirements on the seller of residential real estate; however, that statute does not apply to commercial real estate.

[I]f a seller undertakes to disclose facts within his knowledge, he must disclose the whole truth without doing anything to prevent the other party from making a thorough inspection. For, if in addition to his silence, there is any behavior of the seller which points affirmatively to a suppression of the truth or to a withdrawal or distraction of the parties' attention to the facts, the concealment becomes fraudulent.

*Id.* Indeed, a seller cannot be permitted to partially disclose the facts as he knows them to be, so as to deliberately create a false impression in the mind of the buyer by failing to fully reveal the true state of affairs. *Thompson v. Best,* 478 N.E.2d 79, 84 (Ind.Ct. App.1985).

Although both *Perry* and *Thompson* involved the sale of residential property rather than commercial property, we find a review of the facts of those cases instructive here. In *Perry,* the purchasers of a new home brought a fraud claim against the seller for damages arising out of their purchase of the home. At the time of the sale the seller/bank knew that the home had serious structural defects and was, in fact, sliding down a hill to a river. Among other things, walls had cracked, pillars had become detached, and water had flowed through the house ruining the carpet. Although the bank could have made adequate repairs costing $1,900.00, the bank chose instead to spend only $550.00 in making what may be described as cosmetic repairs. Upon inspection of the home by the buyers and their realtor, the buyers discovered the wet carpet and a detached pillar. The evidence revealed that when the buyers inquired as to the cause of the damage, the bank affirmatively misrepresented the cause of the wet carpet and the detached pillar and assured the buyers that the defects would be cured. There was additional evidence that the inside of the house had been repainted to cover up the water marks. We concluded that such acts amounted to sufficient misrepresentation to impose a duty on the bank and its representative to disclose the whole truth. *Id.* at 432.

Similarly, in *Thompson v. Best,* 478 N.E.2d 79 (Ind.Ct.App.1985), prior to the purchase of a home, the buyer and seller entered into a discussion regarding the presence of a sump pump in the basement of the house and the drainage tiles around the house. The buyer specifically asked the seller if he had had a water problem with the house and the seller responded that he had not. Following his purchase of the home, the buyer discovered a second sump pump which had been previously covered up by the seller's belongings. After another inquiry to the seller regarding any water problems and the need for a second pump, the seller again denied that the house had any drainage problems. To the contrary, the evidence showed that seller experienced severe drainage difficulty in the home's basement while residing in the home. As a result of the drainage problems, the buyer experienced flooding of major proportions in the basement. Based upon this evidence, we concluded that "once [the seller] took it upon himself to explain the house's drainage situation, *vis a vis* describing the tasks of the sump pump and the tiles, he was required to disclose the entire situation, not just those portions that would not spoil a sale of the house." *Id.* at 84.

The facts of the instant case do not rise to the level of either *Perry* or *Thompson,* and are insufficient to support a fraud claim. The circumstances surrounding the parties' relevant dealings with one another are not in dispute. While touring the Building with Bank representative Southworth, Schuyler inquired into the visible water damage he noticed to the lower level of the Building. Southworth responded that the water damage was caused by a broken water heater. There is no evidence to suggest that Southworth's explanation of the cause of the visible damage was inaccurate, and Schuyler asked nothing further.

Unlike in *Perry,* the Bank made no misrepresentation regarding the cause of the visible damage to the lower level of the Building. Southworth answered fully and honestly the question posed to him. There is no evidence that the Bank, or Southworth as its representative, engaged in deceptive conduct in an attempt to conceal any material facts regarding the Building's water history.

Moreover, unlike the "partial" disclosure in *Thompson,* Southworth did not undertake to

explain the sewer/septic system of the Building, the drainage capabilities of the Building, or the Building's experience seven years earlier during the 1981 flood. Southworth merely explained the damage caused by the broken water heater, the only damage which Schuyler had inquired about. Schuyler, an experienced commercial real-estate developer, made no inquires regarding whether the Building had experienced any externally-generated water problems such as seepage or sewer backup or, in fact, whether the Building had any problems whatsoever other than the visible damage he viewed upon touring the Building. We disagree with Schuyler that the evidence supports that the Bank somehow misled him into believing that the broken water heater was the "only" problem involving water that the Building had ever experienced. Such an inference from Southworth's representation is unreasonable and unsupported by case law.

As a matter of law, the Bank had no duty to disclose the Building's entire water history to Schuyler. In the absence of a duty, mere silence is not actionable fraud. *Perry,* 467 N.E.2d at 431. There was insufficient evidence to support the jury's verdict on the issue of fraud, and judgment on the evidence is appropriate. Accordingly, Schuyler is not entitled to compensatory damages for his fraud claim.[2] Moreover, because compensatory damages are a prerequisite to an award of punitive damages, *Sullivan v. American Cas. Co. of Reading, Pa.,* 605 N.E.2d 134, 140 (Ind.1992), Schuyler is similarly not entitled to punitive damages on this issue. Thus, the need for a new trial on punitive damages has been obviated.

The judgment is vacated and the cause is remanded with instructions to enter judgment for the Bank.

HOFFMAN and STATON, JJ., concur.

---

**2.** Since we determine that judgment on the evidence is appropriate, we need not consider the parties' arguments concerning various items of compensatory damages.