Victor JEFFREY and Lynell Jeffrey,
Appellants–Plaintiffs,

v.

The METHODIST HOSPITALS, Paul Okolocha, M.D., Okolocha Medical Corp., and Okolocha Medical, Pain and Weight, Appellees–Defendants.

No. 45A03–1012–CT–636.

Court of Appeals of Indiana.

Oct. 25, 2011.

Robert Montgomery, Munster, IN, Attorney for Appellant.

Stephen A. Tyler, Johnson & Bell, Ltd., Crown Point, IN, Attorney for Methodist Hospitals.

Robert F. Parker, Daniel A. Gioia, Burke Costanza & Carberry LLP, Merrillville, IN, Attorneys for Appellees, Paul Okolocha, M.D., Okolocha Medical Corp. and Okolocha Medical Pain and Weight.

## OPINION

MAY, Judge.

Victor and Lynell Jeffrey appeal summary judgment for Methodist Hospital and partial summary judgment for Paul Okolocha, M.D. ("the Doctor"). We affirm the judgment for the Doctor, reverse the judgment for the Hospital, and remand.

## FACTS AND PROCEDURAL HISTORY

The facts most favorable to the non-moving party, the Jeffreys, are that they planned to adopt a child and V.S. intended to place her unborn child for adoption. The Jeffreys would adopt the child only if there were no "signs of significant health issues." (App. of the Appellants (hereinafter "App.") at 100.) The child was born at Methodist Hospital on February 12, 2006. The next day Lynell asked Lynn Wronko, a social worker employed by Methodist whose job included discussing a child's birth abnormalities with prospective adoptive parents, about the child's health. Lynell told Wronko she had rejected at least three prospective adoptions because the adoptee might be a special needs baby, and "specifically told Ms. Wronko that she was relying on Ms. Wronko's judgment in deciding to adopt" V.S.' child. (Br. of the Appellants at 4.) Wronko told her the child was healthy and without any abnormalities.

On February 15, Lynell traveled to the Hospital from her home in New York and met with Wronko and Head Nurse Kash. Both knew Lynell was relying on information they provided in deciding whether to

adopt the child. Both assured her the child was lactose intolerant but otherwise normal. On that day V.S.'s outpatient chart included a report of a sonogram[1] ordered by the Doctor that indicated the child had a large hole in the left side of his brain,[2] a condition associated with developmental delay, retardation, paralysis, and other severe neurological defects.

The Hospital did not have a procedure to ensure that outpatient records were made part of the inpatient chart.[3] When the Jeffreys' attorneys requested the hospital records, the hospital sent the inpatient records, which did not include the sonogram report.[4] The report had been sent to the Doctor's office, and the Jeffreys asked for the Doctor's records in February of 2006. However, the Doctor would not provide his records because V.S.'s medical bill was not paid.

The Jeffreys completed the adoption in August of 2006. In December of 2006, they learned the child had severe neurological deficits that would have caused them not to complete the adoption if they

had known of the condition. In April of 2007, the Jeffreys received V.S.'s medical records from the Doctor, which records included the sonogram report that had been in V.S.'s outpatient chart at Methodist on February 15, 2006.

The Jeffreys commenced malpractice actions against the Doctor and the Hospital, both of which brought motions for summary judgment and for preliminary determination of law. The trial court granted summary judgment for the Hospital and partial[5] summary judgment for the Doctor.

## DISCUSSION AND DECISION

Summary judgment on a motion for a preliminary determination is subject to the same standard of appellate review as any other summary judgment. *Boggs v. Tri–State Radiology, Inc.,* 730 N.E.2d 692, 695 (Ind.2000), *reh'g denied.* Summary judgment is appropriate only where the evidence shows there is no genuine issue of material fact and the moving party is enti-

---

1. The sonogram report is also referred to by the parties as an ultrasound report.

2. One deponent described the hole as a "large hypoechoic area." (App. at 77.) "Hypoechoic" is defined, in ultrasonography, as "giving off few echoes; said of tissues or structures that reflect relatively few of the ultrasound waves directed at them." http://medical-dictionary.thefreedictionary.com/hypoechoic (citing Miller–Keane Encyclopedia and Dictionary of Medicine, Nursing, and Allied Health, Seventh Edition. (2003)), last visited September 12, 2011.

3. A deponent who testified about the hospital's record-keeping system was asked whether, if someone had an abnormal ultrasound and then went to the hospital ten days later to deliver a child, the results of the sonogram would be placed with the baby's inpatient records, and she responded:

> The mother's information does not get put into the baby's chart, no. The sonogram

was done on the mother. There's two medical records. One being the mother, one being the child. So anything done before the child was born goes into the mother's chart.

(App. at 64.)

4. V.S. executed two authorizations for the release of medical records—one for her own records and one for the child's records. In both, V.S. authorized the Hospital's disclosure of "[a]ny and all medical, general . . . and/or health information pertaining to [the mother or child] which is now or in the future may be in the possession or under the control of [the Hospital]." (App. of Appellee The Methodist Hospitals, Inc. (hereinafter "Hospital App.") at 92–93.) The Jeffreys' counsel directed the request for those records to the Hospital's social worker.

5. Certain claims the Jeffreys made against the Doctor were derivative of injuries to the child and were not resolved on summary judgment.

tled to judgment as a matter of law. *Id.*; Ind. Trial Rule 56(C). All facts and reasonable inferences drawn from those facts are construed in favor of the nonmoving party. *Boggs,* 730 N.E.2d at 695. When the moving party asserts the statute of limitations as an affirmative defense, however, and establishes that the action was commenced beyond the statutory period, the burden shifts to the nonmovant, here the Jeffreys, to establish an issue of fact material to a theory that avoids the defense. *Id.*

### 1. *The Hospital*

#### A. *Hospital Records*

The trial court determined the Hospital had no duty to provide the sonogram report to the Jeffreys because, while the Jeffreys made three requests to the Hospital for medical records, the sonogram report was "not within the description of the documents requested." (App. at 253.) Summary judgment on that ground was error.[6]

The Hospital notes that, as a covered entity under the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1320 *et seq.*, its duty, when it receives valid authorization for disclosure of protected health information, is to "make the disclosure in a manner that is consistent with the terms of the authorization." (Br. of Appellee The Methodist Hospitals, Inc. (hereinafter "Hospital Br.") at 11) (citing 45 C.F.R. 164.508). There was designated evidence the Hospital kept outpatient records separate from inpatient records. The outpatient records were kept in a "drop file," (App. at 62), and inpatient records were kept in a different file. An abnormal pre-natal sonogram would be placed with the mother's chart and not with the child's chart.

The Hospital's Social Services Department "has access to the entire medical record of that patient." (*Id.* at 66.) The Hospital maintains a "master patient index," (*id.* at 68), that "tells you that this patient has also another record and you go pull it." (*Id.*) "Everything is there." (*Id.* at 69.) "[S]ocial services would be given the information that [the Hospital] housed,'" (*id.* at 70), but only that information the social worker specifically requested.

The record reflects V.S. executed two authorizations for the release of medical records—one for her own records and one for the child's records. In both, V.S. authorized the Hospital's disclosure of "[a]ny and all medical, general . . . and/or health information pertaining to [the mother or child] which is now or in the future may be in the possession or under the control of [the Hospital]." (Hospital App. at 92–93.) The Jeffreys' counsel directed the request for those records to the Hospital's social worker.

■ The Hospital has not provided a factual or legal explanation of how a sonogram report in V.S.'s outpatient file could be outside her authorization for the Hospital to release "any and all . . . information" in the hospital's possession. (*Id.*) We decline the Hospital's invitation to hold, as a matter of law, that the Jeffreys had not submitted a "request for the ultrasound supported by [the mother's] valid authorization for its release," (Hospital Br. at 14), or that the Jeffreys "failed to exercise due diligence by requesting all of the pertinent medical records before they completed the adoption." (*Id.*)

---

6. Because we so hold, we need not address the Jeffreys' alternative argument the Hospital had a duty to keep the sonogram results, which were in V.S.'s outpatient records, with the inpatient records maintained by the hospital.

B. *Statements by Hospital Employees*

The trial court determined Methodist was not liable for negligent misrepresentation because the Jeffreys should not have relied on general statements by the social worker and nurse. The Jeffreys argue the hospital "assumed a duty to communicate accurate and complete information" when it permitted or expected its employees to make affirmative statements about a child's medical status. (Br. of the Appellants at 8.) The Hospital does not explicitly argue against its assumption of that duty.

■ Instead the Hospital argues the Jeffreys are claiming negligent misrepresentation when "Indiana law does not recognize negligent misrepresentation under circumstances like those at issue in this case." (Hospital Br. at 15.) According to the Hospital, the Jeffreys' claim cannot succeed because the Hospital's nurse and social worker do not fall "within the limited class of professionals—brokers, attorneys, abstractors, and surveyors—to whom our courts have expressly applied tort liability for negligent misrepresentation," (*id.* at 17), and because the Jeffreys should not have relied on the nurse's and social worker's statements.

■ We cannot say an action for negligent misrepresentation is, as a matter of law, unavailable to the Jeffreys.[7] One who,

> in the course of his business, profession, or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their

justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Restatement (Second) of Torts § 552 (1977) (quoted in *U.S. Bank, N.A. v. Integrity Land Title Corp.,* 929 N.E.2d 742, 747 (Ind.2010)).

In *U.S. Bank,* our Indiana Supreme Court addressed "whether the issuance of a title commitment and subsequently issued title insurance policy give rise in Indiana to a tort cause of action for negligent misrepresentation against a title insurer or commitment issuer, separate and apart from the contractual obligations of the title policy." 929 N.E.2d at 746. It determined U.S. Bank's claim could go forward:

> A professional may owe a duty to a third party with whom the professional has no contractual relationship, but the professional must have actual knowledge that such third person will rely on his professional opinion. [*Thomas v. Lewis Eng'g, Inc.,* 848 N.E.2d 758, 760 (Ind.Ct.App. 2006)] (stating that the actual knowledge prong requires contact between the professional and the third party, not mere foreseeablity that a third party may rely on the professional opinion).

*Id.* at 747. Therefore, Integrity had a duty under Restatement § 552 to communicate the state of a title accurately when issuing its preliminary commitment. *Id.* at 749.

Among the factors supporting that result were:

> the relationship between Integrity and [U.S. Bank's assignor] was of an advisory nature. Integrity had superior

---

**7.** We initially decline to hold the class of professionals who might be subject to negligent misrepresentation claims is as "limited" as the Hospital argues. We acknowledge Indiana decisions that have held brokers, attorneys, abstractors, and surveyors liable for negligent misrepresentation, but the Hospital directs us to no authority indicating liability is limited to those professions.

knowledge and expertise, was in the business of supplying title information, and was compensated for the information it provided to [U.S. Bank's assignor]. Integrity deliberately provided specific information in response to a request by [U.S. Bank's assignor], to guide [U.S. Bank's assignor] in its transaction with a third party, and Integrity affirmatively vouched for the accuracy of the information. On these facts, we are convinced that applicable tort law permits U.S. Bank's tort claim to go forward.

*Id.* at 750. We cannot say, in light of those factors, that an action for negligent misrepresentation was, as a matter of law, unavailable to the Jeffreys. The relationship between the Hospital and the Jeffreys might be characterized as "advisory." The Hospital presumably had superior knowledge and expertise with regard to the information its employees gave the Jeffreys, and it "was in the business of supplying" information of that nature. There are, at the least, genuine issues as to whether the Hospital "deliberately provided specific information in response to a request by" the Jeffreys and whether it "affirmatively vouched for the accuracy of the information."

■ Nor may we hold the Jeffreys' reliance on the statements by the Hospital's employees was, as a matter of law, unjustified. Whether reliance was justified is, on conflicting evidence, a matter for the jury to determine. *Biberstine v. New York Blower Co.,* 625 N.E.2d 1308, 1316 (Ind.Ct. App.1993), *reh'g denied, trans. denied.* But where the evidence is so clear as to be susceptible of only one reasonable inference, it is for the court to determine as a matter of law whether plaintiff was justified in relying on the representation. *Id.* We have accordingly found reliance not justified as a matter of law when, for example, a plaintiff relied on oral representations by agents of defendant savings and loan that were inconsistent with a written deposit agreement, *Gary Hobart Savings & Loan Ass'n v. Strong,* 99 Ind. App. 422, 190 N.E. 373, 374 (1934), *reh'g denied,* and when "the plaintiffs knew as much about the facts of the underlying transaction" as did the person making the misrepresentation. *Plymale v. Upright,* 419 N.E.2d 756, 768 (Ind.Ct.App.1981).

The Hospital asserts, without citation to authority, the Jeffreys' reliance was not justifiable because "only physicians are permitted by law and qualified by training to diagnose and treat injury and illness." (Hospital Br. at 18.) Therefore, it asserts, it cannot be "bound by a duty based on a custom and practice [that exists] only in the mind of the plaintiff." (*Id.*) The Jeffreys designated evidence that it was the Hospital social worker's responsibility to discuss significant birth abnormalities with the adoptive parents; the Jeffreys told the social worker they did not want to adopt a child with medical issues or special needs, and they needed records about the mother and child in order to make an informed decision about the adoption; the social worker had access to the medical records of the mother and the child; the Jeffreys were assured the social worker had reviewed the hospital records; they asked the nurse specific questions about the child's health and whether there were any abnormalities; and the nurse told the Jeffreys she had reviewed the hospital records and assured them the child was "healthy and adorable." (App. at 101.)

This is not a situation where the Jeffreys knew as much about the facts of the "underlying transaction" as did the person making the misrepresentation, as in *Plymale,* or relied on oral representations that were inconsistent with other information they had, as in *Gary Hobart Savings & Loan Ass'n.* As there are genuine issues of

material fact as to whether their reliance on the statements by the nurse and social worker was justified, summary judgment for the Hospital on that basis was also improper.

### 2. Dr. Okolocha

■ The Indiana Medical Malpractice Act limitations period is two years and runs from the date of the negligent act or omission: A claim "may not be brought against a health care provider based upon professional services or health care that was provided or that should have been provided unless the claim is filed within two (2) years after the date of the alleged act, omission, or neglect." Ind.Code § 34-18-7-1(b). When the moving party asserts the statute of limitations as an affirmative defense and establishes that the action was commenced outside the statutory period, the burden shifts to the non-moving party to establish an issue of fact material to a theory that avoids the affir-

mative defense. *Williams v. Adelsperger*, 918 N.E.2d 440, 445 (Ind.Ct.App.2009), *trans. denied.* Any doubt as to a fact or an inference to be drawn is resolved in favor of the non-moving party, so in determining the discovery date of medical malpractice, we construe all facts in favor of the Jeffreys as the nonmovants. *Id.*

■ The statute requires a complaint to be filed within two years after the alleged negligent act or omission,[8] but the date on which the limitations period is activated—the "trigger date"—may in certain circumstances be deferred. *Overton v. Grillo*, 896 N.E.2d 499, 502 (Ind.2008), *reh'g denied.* A plaintiff who cannot reasonably know of the alleged malpractice within the two-year period may institute a claim for relief within two years from the trigger date.[9] *Id.* If a trigger date occurs before the expiration of the limitations period, the plaintiff's claim will be barred unless filing before the expiration of the

---

8. It has been difficult to determine exactly what the Jeffreys allege was the "negligent act or omission;" their original malpractice complaint does not appear to have been included in the record they provided us. As best we can determine, the alleged malpractice was not the Doctor's diagnosis or treatment, but rather his delay in providing the sonogram results. *See* Jeffreys' Response in Opposition to Dr. Okolocha's Motion for Summary Judgment:

> The actual basis for the cause of action, the "trigger," was not the diagnosis of potential disability, *per se*, but rather the subsequent discovery that [the Doctor] had wrongfully concealed critical medical information pertaining to the potential disability. It was the concealment of the test results and the failure to make a clinical documentation that harmed [the Jeffreys].

(App. at 266.) (*And see* Br. of the Appellants at 7: "The failure of Dr. Okolocha *to timely release all his records* to the Jeffreys' attorneys" was a proximate cause of their lack of knowledge about the child's condition (emphasis added).)

9. In their reply brief the Jeffreys argue at some length that the limitations period was tolled by the Doctor's fraudulent concealment. We decline to address fraudulent concealment, as no such argument was offered in the Jeffreys' initial brief. We acknowledge the Jeffreys make an assertion in their initial brief, without explanation or citation to the record, that the Doctor, "either by deception or a violation of duty, concealed from the Jeffreys material facts thereby preventing the Jeffreys from discovering a potential cause of action." (Br. of the Appellants at 17.) This does not amount to the "argument" our appellate rules require. *See Daniels v. State*, 515 N.E.2d 530, 530 (Ind.1987) (Daniels did not "present argument identifying which elements of the offense he contends were not proven, nor does he explain in what other manner the evidence was insufficient. Failure to present cogent argument operates as a waiver of this issue on appeal."). Grounds for error may be framed only in an appellant's initial brief, and if addressed for the first time in the reply brief, they are waived. *Monroe Guar. Ins. Co. v. Magwerks Corp.*, 829 N.E.2d 968, 977 (Ind.2005).

two-year period was not possible with reasonable diligence. *Id.* In any event the complaint must be filed within a reasonable period after the trigger date. *Id.*

 The trigger date, whether before or after the expiration of the limitations period, is the point at which the plaintiff either knows of malpractice or learns of facts that, in the exercise of reasonable diligence, should lead to the discovery of the malpractice and the resulting injury. *Id.* The question of when a plaintiff discovers facts that, in the exercise of reasonable diligence, should lead to the discovery of medical malpractice and resulting injury is often one of fact. *Williams,* 918 N.E.2d at 445. But the trigger date becomes a matter of law when it is clear that the plaintiff knew, or should have known, of the alleged symptom or condition, and facts that in the exercise of reasonable diligence would lead to discovery of the potential of malpractice. *Herron v. Anigbo,* 897 N.E.2d 444, 450 (Ind. 2008). Reasonable diligence requires more than inaction by a patient who, before the statute has expired, does or should know of both the injury or disease and the treatment that either caused or failed to identify or improve it, *even if there is no reason to suspect malpractice. Id.* at 449 (emphasis added).

The trial court correctly determined the Jeffreys' claim against the Doctor was time-barred. The trial court determined the limitations period began to run

> on the day of the alleged negligent act, February 1, 2006. Mr. and Mrs. Jeffrey obtained the medical records sought from Dr. Okolocha on April 5, 2007, which was within the two-year statute of limitations. Mr. and Mrs. Jeffrey then had several months to consider whether to file suit against Dr. Okolocha. Mr. and Mrs. Jeffrey filed their first amended complaint with the Department of Insurance, adding Dr. Okolocha as a defendant, on August 28, 2008.

(App. at 293.)

The Jeffreys appear to concede the Doctor provided the records April 5, 2007, and thus that was the earliest date when "there would be a possibility of knowing that a sonogram had previously revealed a birth defect." (Br. of the Appellants at 17.) If April 5, 2007, was the "trigger date," the Jeffreys could have filed their claim within the two-year limitations period, which ended January 31, 2008. Thus, the Jeffreys' claim will be barred unless filing before February 1, 2008 was not possible with reasonable diligence. *See Overton,* 896 N.E.2d at 502.

 The Jeffreys assert "it is neither realistic nor reasonable to assume that [April 5] should be deemed the trigger date." (Br. of the Appellants at 17.) They offer no legal authority to support their argument why the trigger date was sometime after April 5, nor do they explain when it might have been. They have accordingly waived that argument for appeal. *See* Ind. Appellate Rule 46(A)(8)(a) ("The argument must contain the contentions of the appellant on the issues presented, supported by cogent reasoning. Each contention must be supported by citations to the authorities, statutes, and the Appendix or parts of the Record on Appeal relied on, in accordance with Rule 22.").

 We must therefore determine whether the Jeffreys were reasonably diligent in their efforts to file their action within the limitations period. They were not. Reasonable diligence "requires pursuing the facts to determine whether there is a claim," *Herron,* 897 N.E.2d at 449, and requires "more than inaction by a patient ... even if there is no reason to suspect malpractice." *Id.* A plaintiff is obliged to "inquire into the possibility of a claim with-

in the remaining limitations period, and to institute a claim within that period or forego it." *Id.*

The Jeffreys note the records the Doctor finally released "did not contain any clinical reference to [the child's] brain abnormality," (Br. of the Appellants at 17), but the Jeffreys concede they had "learned of the possibility of [the child's] dire medical condition on December 10, 2006." (*Id.*) They asked other physicians who had treated the child what caused the brain abnormality and were told it was congenital and nothing could have been done to prevent it.

The Jeffreys did not make a reasonably diligent effort to file within the approximately ten months remaining in the limitations period. To the extent the Jeffreys' allegation of malpractice is premised on the Doctor's failure to provide the sonogram, they became aware of that malpractice when he provided the record within the limitations period. If the malpractice they allege is the Doctor's failure to include with the sonogram any clinical reference to the child's brain abnormality, that failure was apparent when the records were provided, because the Jeffreys had, by that time, been aware for some four months of "the possibility of [the child's] dire medical condition." (*Id.* at 17.)

As the Jeffreys did not file their complaint within a reasonable period after the trigger date, the Doctor was entitled to partial summary judgment.

## CONCLUSION

We affirm partial summary judgment for Dr. Okolocha, as the complaint against him was filed too late. We reverse the summary judgment for the Hospital and remand, as there are genuine issues of fact as to the Hospital's duty to provide the records the Jeffreys requested and wheth-

er its employees negligently misrepresented the child's status.

Affirmed in part, reversed in part, and remanded.

NAJAM, J., and RILEY, J., concur.