In the

# United States Court of Appeals
## For the Seventh Circuit

No. 25-1519

PETERS BROADCAST ENGINEERING, INC.,

*Plaintiff-Appellant,*

*v.*

PEM CONSULTING GROUP, LLC, *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Indiana, Fort Wayne Division.
No. 1:21-cv-00219 — **Holly A. Brady**, *Chief Judge.*

ARGUED APRIL 9, 2026 — DECIDED JUNE 17, 2026

Before EASTERBROOK, RIPPLE, and LEE, *Circuit Judges.*

RIPPLE, *Circuit Judge.* This case arises out of a business relationship between Peters Broadcast Engineering, Inc. ("Peters Broadcast"), a telecommunications company, and PEM Consulting Group, LLC d/b/a Pyramid Consulting & Construction, LLC ("PEM"), a company that worked with Peters Broadcast. The district court granted summary judgment for the defendants on all claims. For the reasons set forth in the

following opinion, we affirm the judgment of the district court.[1]

# I

# BACKGROUND

## A. Facts

Peters Broadcast is a small telecommunications engineering company in Indiana. The company is owned and operated by Robert Peters. On May 21, 2019, Peters Broadcast signed a Construction Master Services Agreement with Crown Castle USA, Inc. ("Crown Castle"). This agreement contemplated that, from time to time, Crown Castle would issue purchase orders to Peters Broadcast for construction work on cell tower sites in Indiana. The agreement did not guarantee, however, that Peters Broadcast would receive any specific number of purchase orders. The agreement also permitted Peters Broadcast to engage subcontractors to complete the work but required that the subcontractors be approved by Crown Castle before work began.

In early May, before Mr. Peters signed the Crown Castle agreement, he began discussions with Chris Smith, a former

---

[1] The district court had subject matter jurisdiction under 28 U.S.C. § 1332. Peters Broadcast is an Indiana corporation with its principal place of business in Indiana. Defendant PEM is a New Jersey LLC and is composed of members who are citizens of New Jersey, Illinois, and Michigan. Defendant Philip Miller is a citizen of New Jersey. Defendant Atlantic Casualty Insurance Company is incorporated in North Carolina and has its principal place of business there as well. Defendant Chesapeake Employers' Insurance Company is incorporated in Maryland with its principal place of business in Maryland. We have jurisdiction to review the district court's grant of summary judgment under 28 U.S.C. § 1291.

employee of his, about taking on the work as a subcontractor. Smith in turn introduced Mr. Peters to defendant Philip Miller. Mr. Miller is the owner-operator of defendant PEM. Mr. Peters testified that he wanted to subcontract work to PEM because "[he] did not have the resources or the cash reserve to bring in four or five crews and maintain them; nor did [he] want to, frankly."[2] It was his hope that PEM could provide those resources.

The first communication in the record between Mr. Peters, Mr. Miller, and Smith is an email dated May 5, 2019. In the email, Smith proposed an agreement between Smith's company (Frequency 1), Peters Broadcast, and PEM for the completion of work under the Crown Castle Master Services Agreement. Under a section of the email titled "PBE-Pyramid Initial Contract Agreement," Smith wrote:

> This is a base line agreement to get things moving between us [sic] Look things over and lets [sic] discuss any changes needed so we can all be on the same page and progress moving forward as soon as possible.
>
> I would like to propose the following construction agreement between all parties involved[.][3]

The email went on to explain that Peters Broadcast was the "Customer Contract holder," that Mr. Miller and PEM would provide field crews and equipment and complete all sites, and that Smith and Frequency 1 would oversee all field crews and site processes, scheduling, field construction management,

---

[2] R.142-2 at 23:16–23.

[3] R.129-4 at *1.

and customer relations.[4] Smith also proposed a base structure in which Peters Broadcast would retain ten percent of all purchase orders from Crown Castle. It did not specify how the remaining ninety percent would be split between Frequency 1 and PEM. Mr. Peters testified that this email was "the first draft in discussions" and that "there was no agreement at that time. It was a proposal."[5] Miller similarly testified that the email did not reflect a final agreement.

Despite the absence of any final written agreement, sometime in May 2019, Smith and his company began work at Crown Castle sites. PEM obtained a loan in the amount of $149,999.99 and used it to pay Smith and his crews.[6] PEM obtained trucks for Smith and his crews, which were leased by a separate company, Knudson, L.P. Between May and July, PEM paid Smith and his crews approximately $36,000 for their work.[7]

Mr. Miller testified that the crews completed one site per week. Mr. Peters testified that "right out of the gate," Peters Broadcast also had to cover expenses, supply crews with

---

[4] *Id.* Although Frequency 1 is a party to the alleged contract, neither Smith nor Frequency 1 is a party in this litigation. Smith did not sit for a deposition and did not submit an affidavit.

[5] R.142-2 at 29:24, 41:01–02.

[6] Peters Broadcast disputes whether PEM used this money to pay Smith and his crews, but it pointed to no evidence supporting its contention. R.141 at ¶ 8.

[7] PEM asserts, and Peters Broadcast admits, that Peters Broadcast received $118,000. Peters Broadcast disputed whether this evidence was material but did not otherwise dispute that it received those payments. *Id.* at ¶¶ 14, 16.

equipment and vehicles, and locate warehouse space for the projects.[8]

While the work progressed, PEM and Peters Broadcast continued to negotiate a written agreement. Counsel for Peters Broadcast contacted PEM to negotiate the written agreement for the first time on July 12, 2019. On the same day, Peters Broadcast sent a check to PEM in the amount $46,365.50—apparently the first payment to PEM—but instructed it not to deposit the funds because Peters Broadcast had not yet received payment from Crown Castle. Mr. Miller and Mr. Peters then met in Fort Wayne, Indiana, on July 17, 2019. Although the contents of this discussion are disputed, both Mr. Miller and Mr. Peters testified that they discussed Mr. Miller's ability to provide funding and equipment to complete Crown Castle sites.[9] Peters Broadcast asserts, and Mr. Peters testified, that Mr. Miller talked about "how successful he was, how much money he had, that this would be an easy project for him, and he had the wherewithal and the knowledge to do this and the people and the equipment."[10] Mr. Miller did not tell Mr. Peters that he was acquiring a loan to fund the project or that the trucks he provided belonged to Knudson.

Work continued, but apparently not to Peters Broadcast's satisfaction. Mr. Peters sent an email to Mr. Miller in early

---

[8] R.142-2 at 49:14–20. However, Mr. Peters also testified that he did not know how much he spent and had not produced the entire record of the expenses. *Id.* at 49:03–09, 49:21–22.

[9] Mr. Miller testified that he told Mr. Peters he would bring "some crews and equipment … [and] initial funding to get the crews going." R.126 at 25:13–15.

[10] R.142-2 at 22:07–11.

August, telling him that Peters Broadcast was compensating crew members, a task that he believed was PEM's responsibility. He wrote that he had "now in good faith extended financially beyond [his] obligations for the proposed 10%."[11] He also warned that the lack of payments was putting the Crown Castle project "in serious jeopardy."[12] Mr. Miller testified that he was confused by this communication, because he was under the impression that he would decide which sites to do on a site-by-site basis, and had no continuing obligation to outfit all sites with crews and equipment.[13] Shortly after this email exchange, Peters Broadcast made a $6,000 payment to PEM. PEM did not request this payment but also does not maintain that it returned the payment. As far as we can discern from the record, the funds were retained by PEM and Mr. Miller.

Believing that Peters Broadcast was being paid by Crown Castle but failing to remit payment to PEM, Mr. Miller contacted Crown Castle in August to obtain payment directly. As far as we are aware, PEM did not obtain any direct payments from Crown Castle. On September 5, PEM deposited the $46,365.50 previously given to it by Peters Broadcast, but Peters Broadcast charged the amount back on September 10. In October, Mr. Miller emailed a paralegal at Crown Castle, explaining the situation and asking for help obtaining payment.

---

[11] R.126 at *207.

[12] *Id.* The record is unclear about what was happening at the work sites. There is no evidence showing how many sites were completed or how quickly. There is no evidence showing how many crew members were uncompensated or for how long.

[13] R.126 at 85:08–23, 86:03–19.

On an unspecified date after this, PEM left the project. Mr. Peters testified that he did not know whether the trucks supplied by PEM continued to be used after they left.

Crown Castle terminated its agreement with Peters Broadcast sometime in late 2019. Crown Castle cited poor work product at the cell tower sites as the reason for the termination.

## B. Proceedings in the District Court

Peters Broadcast filed its complaint in 2021. It named PEM, Mr. Miller, Atlantic Casualty Insurance ("Atlantic"), and Chesapeake Employers' Insurance Company ("Chesapeake") as defendants. The operative amended complaint contains multiple claims against Mr. Miller and PEM: breach of contract (Count I), fraud (Count III), fraudulent inducement to contract (Count IV), unjust enrichment (Count V), fraudulent misrepresentation (Count VI), negligent misrepresentation (Count VII), and tortious interference with business relations (Count VIII). Count II sought a declaratory judgment that Atlantic and Chesapeake are obligated to provide coverage for PEM and Mr. Miller.

The district court granted summary judgment on all counts. It determined that there was no contract between Peters Broadcast and PEM or Mr. Miller, noting Mr. Peters's repeated statements that no contract existed. It also examined the parties' dealings, noting that even though Mr. Peters maintained that he understood PEM to be responsible for equipment, he had also rented and supplied equipment. The court decided that, at most, there was an unenforceable

"agreement to agree later."[14] The court further concluded that there was nothing in the record from which the terms could be identified. This ruling resolved both the breach of contract claim and the fraudulent inducement claim.

As to the fraud claims in Counts III and VI, the district court found that the evidence could not support reliance because the fraudulent statements were allegedly made in July, well after Mr. Miller and PEM were actively engaged in the project. The court also concluded that any statements about the source of funds or trucks were not material, because there was no evidence that those facts would have changed Mr. Peters's decision to do business with Mr. Miller. Finally, the court decided that the alleged injury connected to the fraud claims was not sufficiently distinct from the injury alleged from the breach of contract claim.

The court dismissed the unjust enrichment claim because there was no evidence that PEM obtained a benefit from Peters Broadcast. It reasoned that the first payment of $46,365.50 was charged back by Peters Broadcast, so no benefit was conferred on PEM. The court then noted that neither PEM nor Mr. Miller requested the second payment of $6,000.

Turning to the tortious interference claim, the district court held that it failed because Peters Broadcast had not demonstrated that PEM committed an illegal act (here, fraud) either in representations made to Peters Broadcast or to Crown Castle. It decided, in the alternative, that PEM had no duty to avoid speaking to Crown Castle, and that its communications with Crown Castle were not malicious or exclusively for the purpose of harming Peters Broadcast. The court

---

[14] R.165 at 12.

concluded that there was no evidence that PEM's contact with Crown Castle had resulted in any damages.

Finally, the court rejected the negligent misrepresentation claim, ruling that it is unavailable in this context under Indiana law. Having dismissed all claims against PEM and Mr. Miller, the court entered summary judgment for Atlantic and Chesapeake sua sponte.

## II

## DISCUSSION

We review an order granting summary judgment de novo. *Mesco Mfg., LLC v. Motorists Mut. Ins. Co.*, 145 F.4th 705, 708 (7th Cir. 2025). Summary judgment is proper where the evidence shows there is no genuine issue of material fact and the non-moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Atlanta Gas Light Co., v. Navigators Ins. Co.*, 164 F.4th 1038, 1048 (7th Cir. 2026). The party opposing summary judgment may not rest on the allegations or denials in its pleadings; it must present evidence of specific facts that are genuinely at issue. *Celotex Corp.*, 477 U.S. at 321 n.3; *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008). The parties agree that Indiana law applies to this case. Therefore, "our role is to apply Indiana law as we predict the Indiana Supreme Court would today." *Atlanta Gas Light Co.*, 164 F.4th at 1044 (quoting *Mesco Mfg., LLC*, 145 F.4th at 708).

## A

To establish a claim for breach of contract, the plaintiff must establish the existence of a contract, a breach of that contract, and damages as a result of that breach. *Rogier v. Am. Testing & Eng'g Corp.*, 734 N.E.2d 606, 614 (Ind. Ct. App. 2000).

Whether a set of facts establishes the existence of a contract is a question of law. *Kelly v. Levandoski*, 825 N.E.2d 850, 857 (Ind. Ct. App. 2005).

"The party urging the validity of a contract bears the onus of proving its existence." *OVRS Acquisition Corp. v. Cmty. Health Servs., Inc.*, 657 N.E.2d 117, 125 (Ind. Ct. App. 1995) (quoting *Ochoa v. Ford*, 641 N.E.2d 1042, 1044 (Ind. Ct. App. 1994)). For there to be an oral contract, the parties must agree to all terms of the contract. *Kelly*, 825 N.E.2d at 857. "If a party cannot demonstrate agreement on one essential term of the contract, then there is no mutual assent and no contract is formed." *Lash v. Kreigh*, 202 N.E.3d 1098, 1105 (Ind. Ct. App. 2023) (quoting *Troutwine Ests. Dev. Co., LLC v. ComSub Design & Eng'g, Inc.*, 854 N.E.2d 890, 897 (Ind. Ct. App. 2006)); *see also Simon v. William R. Simon Farms, Inc.*, 245 N.E.3d 1025, 1031 (Ind. Ct. App. 2024) (finding no oral contract where plaintiff admitted in testimony that no agreement was reached).

Peters Broadcast submits that the district court ignored the parties' disagreement about the existence of a contract. It attempts to shift the evidentiary burden to PEM by turning to the "sham contract" doctrine, arguing that where there is prima facie evidence of a contract, the party seeking summary judgment must show that each party unequivocally disavowed the contract. In Peters Broadcast's view, because PEM did not present evidence of disavowal, it is entitled to remand. But this argument fails because Peters Broadcast has not made a prima facie showing that a contract existed.

There is no evidence supporting Peters Broadcast's assertion that a contract existed. It is undisputed that the parties never reached a written agreement. The record contains no communication between the parties prior to the May 5 email

containing a draft written agreement. Peters Broadcast submits that there was a preliminary oral agreement that bound the parties. But there is no evidence in the record explaining when that agreement was made or what terms it contained. Preliminary agreements, made with the intention that they will later be memorialized in writing, can be enforceable, but the parties must agree to all essential terms. *Wolvos v. Meyer*, 668 N.E.2d 671, 674–75 (Ind. 1996); *see also Abercrombie & Fitch Stores, Inc. v. Simon Prop. Grp., L.P.*, 160 N.E.3d 1103, 1109 (Ind. Ct. App. 2020). "Essential terms" include "the terms and conditions of the promises made, including by whom and to whom." *Conwell v. Gray Loon Outdoor Mktg. Grp., Inc.*, 906 N.E.2d 805, 813 (Ind. 2009). The absence of essential terms creates a lack of certainty; this undermines both a finding of mutual assent and the court's ability to identify and remedy a breach. *See* 1 CORBIN ON CONTRACTS § 2.9 (2026).

Both Mr. Miller and Mr. Peters testified that PEM would receive ninety percent of the value of each purchase order completed by PEM, while Peters Broadcast would receive ten percent. But that appears to be where common understanding ends. Mr. Miller testified that he had the option to accept or refuse each purchase order at his discretion. Mr. Peters believed that Mr. Miller and PEM had agreed to complete *all* purchase orders from Crown Castle. The conduct of the parties adds no clarity; while PEM completed the work for some purchase orders, paid crew members, and provided some equipment, including trucks, Peters Broadcast also supplied equipment and paid crews. Additionally, Peters Broadcast has not explained what role, if any, Chris Smith and his company, Frequency 1, had in the alleged preliminary agreement. The May 5 email depicts Smith and Frequency 1 as responsible for all crews and construction management. To add

further confusion, at oral argument, counsel for Peters Broadcast presented an entirely different theory of the preliminary agreement: that it was an "employer-employee" relationship.[15]

The obligations of each of the parties to the contract are essential terms. *Illiana Surgery & Med. Ctr., LLC v. STG Funding, Inc.*, 824 N.E.2d 388, 399 (Ind. Ct. App. 2005). On this record, no reasonable jury could find that PEM and Peters Broadcast had a preliminary agreement containing all essential terms. Contracts exist so that parties can protect their rights. When parties engage in joint business but leave unanswered essential terms, a court should not supply those terms. Accordingly, the district court correctly dismissed Count I and Count IV.[16]

**B**

To establish fraud or fraudulent misrepresentation, Peters Broadcast must prove that (1) the defendants made a material statement of past or existing fact; (2) that was false; (3) the defendants knew or were reckless to the fact that it was false; (4) the defendants made the statements with the intent to deceive; (5) Peters Broadcast reasonably relied on the statement; and (6) Peters Broadcast suffered an injury proximately

---

[15] The audio recording of the oral argument for this case may be found on the court's website. Counsel's description of the preliminary agreement begins at 5:46.

[16] Because there is no contract, Count IV falls with Count I. "Fraudulent inducement occurs when a party is induced through fraudulent misrepresentations to enter into a contract." *America's Directories Inc. v. Stellhorn One Hour Photo, Inc.*, 833 N.E.2d 1059, 1068 (Ind. Ct. App. 2005); *see also Judson Atkinson Candies, Inc. v. Kenray Assocs., Inc.*, 719 F.3d 635, 639 (7th Cir. 2013).

caused by the false statement. *Kesling v. Hubler Nissan, Inc.*, 997 N.E.2d 327, 335 (Ind. 2013), *superseded by statute on other grounds*, IND. CODE § 24-5-0.5-3 (2014); *Wise v. Hays*, 943 N.E.2d 835, 840 (Ind. Ct. App. 2011). Fraudulent misrepresentation additionally requires a showing that the defendant intended to induce the plaintiff to act. *Wise*, 943 N.E.2d at 840.

Peters Broadcast bases its fraud claims on two statements that Mr. Miller allegedly made to Mr. Peters at their first in-person meeting, which occurred in July. The first is Mr. Miller's alleged claim that he had sufficient resources of his own to fund the work on the Crown Castle project.[17] The second is Mr. Miller's alleged claim that he owned trucks that were outfitted and able to complete cell site work.[18]

It is undisputed that both claims, if they were made, were false. Mr. Miller obtained a loan to fund his work and used trucks paid for by Knudson. Mr. Miller and PEM submit, however, that Mr. Miller's alleged statements were not fraudulent because he had no duty to disclose the source of the money or the trucks. It is true that there is no actionable fraud where a party is silent about a matter it has no duty to disclose. *First Bank of Whiting v. Schuyler*, 692 N.E.2d 1370, 1374 (Ind. Ct. App. 1998). But Peters Broadcast's theory of the case is not that Mr. Miller was silent as to the source of funding and trucks, but rather that when he spoke, he was not truthful, and that the falsehood was material to Peters Broadcast's decision-making process. When a party "undertakes to

---

[17] R.95 at ¶¶ 35, 36; R.142-2 at 22:15 ("He assured me it was all his money.").

[18] R.95 at ¶ 26; R.142-2 at 24:01–02 ("And he assured me that he had trailers, trucks.").

disclose facts within his knowledge, he must disclose the whole truth without concealing material facts…." *Ind. Bank & Trust Co. of Martinsville v. Perry*, 467 N.E.2d 428, 431 (Ind. Ct. App. 1984).

Peters Broadcast's claims nevertheless fail for a different reason: There is no evidence that it relied on either of these statements. Reliance requires that the plaintiff take "some kind of action in response to the misstatement." *BSA Constr. LLC v. Johnson*, 54 N.E.3d 1026, 1032 (Ind. Ct. App. 2016). It is undisputed that PEM and Mr. Miller had already started working on the Crown Castle sites when these statements were made in July. Further, Mr. Peters testified that in May, prior to the meeting, he was relying on Smith's representations when he decided to give PEM access to the sites, not Mr. Miller's.[19] Indeed, Peters Broadcast could not have relied on these statements to its detriment because it had already given Mr. Miller and PEM access to the sites when they were made.

Even if Peters Broadcast relied on the statements by remaining in the business relationship, the record does not contain any evidence about how many additional sites PEM worked on after these representations were made. We know only generally what occurred between the parties after this meeting. Since there is no evidence in the record from which the jury could find reliance, summary judgment on Counts III and VI was proper.

---

[19] R.142-2 at 23:08–12.

## C

To prove its unjust enrichment claim, Peters Broadcast must establish: (1) that it conferred a benefit upon PEM at the express or implied request of PEM; (2) that allowing PEM to retain the benefit without restitution would be unjust; and (3) that it expected payment. *Woodruff v. Ind. Fam. & Soc. Servs. Admin.*, 964 N.E.2d 784, 791 (Ind. 2012); *see also Zoeller v. E. Chic. Second Century, Inc.*, 904 N.E.2d 213, 220 (Ind. 2009). Indiana courts understand unjust enrichment "as a doctrine to 'promote justice and equity.'" *Lady Di's, Inc. v. Enhanced Servs. Billing, Inc.*, 654 F.3d 728, 736 (7th Cir. 2011) (quoting *Wright v. Pennamped*, 657 N.E.2d 1223, 1229 (Ind. Ct. App. 1995)).

Peters Broadcast made a payment of $46,365.50 to PEM but charged it back when PEM cashed the check. Mr. Peters testified that he believed the charge-back recouped his losses. In light of the charge-back, there was no benefit conferred and no repayment expected.

Peters Broadcast also contends that PEM received a "benefit" when Peters Broadcast paid for equipment and crews. A "benefit" can be conferred where "one is saved from expense or loss," *Coppolillo v. Cort*, 947 N.E.2d 994, 999 (Ind. Ct. App. 2011) (citation modified), and this would have reduced PEM's losses. However, there is no evidence that PEM requested that Peters Broadcast pay crews or supply equipment. Peters Broadcast has also presented no evidence that PEM impliedly requested that they pay those expenses. Peters Broadcast's payment of expenses, on its own, does not establish an implied request. *See Ritzert Co., Inc. v. United Fid. Bank, FSB*, 935 N.E.2d 756, 763 (Ind. Ct. App. 2010).

Finally, there was a payment of $6,000 from Peters Broadcast to PEM in August. Unlike the other payment, there is no evidence that this sum was charged back or that PEM returned it to Peters Broadcast. However, there is also no evidence that PEM requested this payment. Indeed, the uncontroverted evidence shows that PEM incurred approximately $36,000 in expenses related to the Crown Castle project, and that Peters Broadcast was paid approximately $118,000 by Crown Castle for the work that it and PEM completed. Considering PEM's expenses and Peters Broadcast's gains, there is nothing unjust about PEM retaining the $6,000. *Lady Di's*, 654 F.3d at 736 ("There is simply nothing inequitable or unjust about the plaintiff paying for services it ordered and received."); *SelectSun GmbH v. Porter, Inc.*, 928 F.3d 550, 556 (7th Cir. 2019) ("Porter received no benefit, much less unjust enrichment, by receiving partial payment for the yacht it manufactured and then delivered …."). Summary judgment on the unjust enrichment claim was proper.

**D**

Indiana recognizes the tort of negligent misrepresentation, adopting the definition found in the Restatement (Second) of Torts § 552(1). *U.S. Bank, N.A. v. Integrity Land Title Corp.*, 929 N.E.2d 742, 747 (Ind. 2010). The Restatement provides:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information *for the guidance of others* in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information ….

RESTATEMENT (SECOND) OF TORTS § 552(1) (A.L.I. 1977) (emphasis added).

Indiana courts originally limited this tort to employee-employer disputes. *Troth v. Warfield*, 495 F.Supp.3d 729, 743 (N.D. Ind. 2020) (citing *Eby v. York-Division, Borg-Warner*, 455 N.E.2d 623 (Ind. Ct. App. 1983)). It has expanded recently, but only to situations in which the relationship between the parties can be characterized as "advisory." *Jeffrey v. Methodist Hosps.*, 956 N.E.2d 151, 157 (Ind. Ct. App. 2011). A relationship is advisory when one party has "superior knowledge and expertise," is in the business of giving advice or supplying information, and is compensated for providing the information. *Id.* at 157. Indiana courts have recognized brokers, attorneys, and surveyors as some professions that fit this description. *Id.* at 156 n.7.

Peters Broadcast argues that Mr. Miller made his statements to PEM to "provide guidance" to Peters Broadcast in their business transactions. This stretches the concept of "guidance" beyond what Indiana courts envision. Indiana courts have extended this tort only to situations in which the defendant's primary purpose in speaking is to provide advice, such as in the case of attorneys or brokers. *Id.* at 156 n.7. But Mr. Miller was not retained by Peters Broadcast to give advice on completing the project. He made his statements in the context of a contract negotiation. While it may be foreseeable that the other party in the negotiation will rely on the statements, that does not mean that the statements were provided as "advice." *Cf. Tri-Pro. Realty, Inc. v. Hillenburg*, 669 N.E.2d 1064, 1069 (Ind. Ct. App. 1996) (observing that a seller who falsely claimed to own property at the time of sale did not provide a "professional opinion"). Accordingly, the

district court did not err by granting summary judgment on Peters Broadcast's negligent misrepresentation claim in Count VII.

**E**

The only remaining claim against PEM and Mr. Miller is Count VIII, a claim for tortious interference with business relations, which is premised on Mr. Miller's communications with Crown Castle. The elements of such a claim are: "(1) the existence of a valid [business] relationship; (2) the defendant's knowledge of the existence of that relationship; (3) the defendant's intentional interference with the relationship; (4) the absence of justification; and (5) damages resulting from the defendant's wrongful interference with the relationship." *McCollough v. Noblesville Schs.*, 63 N.E.3d 334, 344 (Ind. Ct. App. 2016). Only the fourth and fifth elements are disputed, and the fourth element is dispositive.

A "lack of justification" requires that the defendant's action was "malicious and exclusively directed to the injury and damage of another." *Morgan Asset Holding Corp. v. CoBank, ACB*, 736 N.E.2d 1268, 1272 (Ind. Ct. App. 2000) (quoting *Winkler v. V.G. Reed & Sons, Inc.*, 638 N.E.2d 1228, 1235 (Ind. 1994)). "[T]he existence of a legitimate reason for the defendant's actions provides the necessary justification to avoid liability." *Id.*

Peters Broadcast argues that Mr. Miller lacked justification because Mr. Miller was not actually a subcontractor of Peters Broadcast when he contacted Crown Castle requesting help to obtain payment from Peters Broadcast. But PEM had a "legitimate reason" to contact Crown Castle: It had not been paid

for work that it had completed on Crown Castle sites.[20] Peters Broadcast admits that, after the charge-back, it paid only $6,000 to PEM and does not dispute that PEM incurred $36,000 in expenses. On this record, a jury could not conclude that Mr. Miller contacted Crown Castle exclusively to injure Peters Broadcast.

## F

Only Count II—a request for declaratory relief against Atlantic and Chesapeake, PEM's insurers—remains. Because there are no claims against PEM and Mr. Miller for which the insurers could owe coverage or indemnification, there was no error in granting summary judgment sua sponte in the insurance companies' favor.

## Conclusion

The judgment of the district court is affirmed.

AFFIRMED

---

[20] R.142-9 at *3.