## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Mar 13 2018, 5:47 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANTS

Robert A. Montgomery
Law Offices of Robert Montgomery
Munster, Indiana

ATTORNEY FOR APPELLEE

Scott B. Cockrum
Patrick P. Devine
Hinshaw & Culbertson LLP
Schererville, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Ellington Jeffrey, a minor by his mother and father, Victor Jeffrey and Lynell Jeffrey and Victor and Lynell Jeffrey, individually,

*Appellants-Plaintiffs,*

v.

Stephen Robertson, Insurance Commissioner, Indiana Department of Insurance,

*Appellee-Defendant.*

March 13, 2018

Court of Appeals Case No. 45A04-1706-CT-1452

Appeal from the Lake Superior Court

The Honorable John M. Sedia, Judge

Trial Court Cause No. 45D01-1208-CT-170

**Robb, Judge.**

# Case Summary and Issue

[1] In 2012, Victor and Lynell Jeffrey (the "Jeffreys")[1] reached a settlement agreement with the healthcare provider for their adopted son, Ellington Jeffrey. The settlement agreement provided for a cash payment of $150,000 to the Jeffreys, individually and as parents of Ellington, and for Ellington's healthcare provider to purchase and make contributions to an annuity for Ellington's benefit. The total value of the annuity is $100,000 and is payable to the Ellington Jeffrey Special Needs Trust.

[2] The Jeffreys then sought additional compensation from the Indiana Patient's Compensation Fund and filed a lawsuit naming as defendant Stephen Robertson, as the commissioner of the Indiana Department of Insurance (the "Commissioner"). The Commissioner subsequently filed a motion for summary judgment alleging the Jeffreys' individual claims did not meet the Indiana's Medical Malpractice Act's ("MMA") definition of "malpractice" and that they were not "patients" under the MMA. The trial court agreed with the Commissioner and determined the $150,000 cash payment to the Jeffreys was not for claims of malpractice; therefore, the Jeffreys failed to meet the statutory minimum amount of a healthcare provider's or insurer's liability to seek

---

[1] Victor and Lynell divorced in 2014 and Lynell now goes by her maiden name, Lynell Canagata. The Jeffreys' Notice of Appeal states the appellant is "Ellington Jeffrey, a minor, by his mother, Lynell Jeffrey." Amended Notice of Appeal at 1. Their complaint, however, states the plaintiffs are "Ellington Jeffrey, a minor by his mother and father Victor and Lynell Jeffrey, and Victor and Lynell Jeffrey, Individually." Indiana Rule of Appellate Procedure 17(A) dictates "the party of record in the trial court . . . shall be a party on appeal." Consequently, both Victor and Lynell are parties and we still refer to them as "the Jeffreys."

additional compensation from the Patient's Compensation Fund. The Jeffreys now appeal, raising two issues for our review, which we consolidate and restate as whether the trial court erred in granting summary judgment in favor of the Commissioner. Concluding the trial court erred in granting summary judgment, we reverse and remand for further proceedings.

# Facts and Procedural History[2]

In 2006, the Jeffreys planned to adopt a child. The Jeffreys specifically intended to adopt a child only if there were no signs of significant health issues and had rejected at least three prior adoptions due to concerns about the child's health. On February 12, 2006, V.S. gave birth to her son at Methodist Hospital and planned to place him with an adoptive family. Lynell spoke with Methodist Hospital's social worker, whose job included discussing a child's birth abnormalities with prospective adoptive parents, and told her she was relying on her judgment in deciding to adopt V.S.'s child. The social worker informed Lynell that V.S.'s child was born healthy and without any abnormalities.

On February 15, 2006, Lynell traveled to Indiana from her home in New York and met with Methodist Hospital's social worker and head nurse. Both assured Lynell that the child, aside from being lactose intolerant, had no significant

---

[2] We held oral argument in this case on February 20, 2018, in Indianapolis, Indiana. We commend counsel for their advocacy.

health issues or abnormalities. The Jeffreys executed a guardianship and took the child, who was later named Ellington, home to New York.

[5]  Prior to completing the adoption, the Jeffreys' attorney requested V.S.'s and Ellington's medical records from Methodist Hospital. Methodist Hospital responded to their request by sending inpatient records, but did not send the Jeffreys any outpatient records.

[6]  The Jeffreys completed Ellington's adoption in August of 2006. In December of 2006, the Jeffreys learned Ellington had severe neurological deficits. If the Jeffreys had known of Ellington's medical condition, they would not have adopted him. In April of 2007, the Jeffreys finally received all the medical records they had requested. They discovered V.S.'s medical records included a sonogram taken on February 1, 2006, indicating Ellington had a large hole in the left side of his brain, a condition associated with developmental delay, intellectual disabilities, paralysis, and other severe neurological defects.

[7]  Thereafter, the Jeffreys filed a proposed medical malpractice complaint against Methodist Hospital and V.S.'s and Ellington's doctor with the Indiana Department of Insurance and with the trial court. Methodist Hospital and the doctor both filed motions for summary judgment, which the trial court granted. As to Methodist Hospital, the trial court determined the sonogram report did not fit within the description of the documents requested by the Jeffreys. The trial court also determined that, with respect to the Jeffreys' claim of negligent

misrepresentation, the Jeffreys should not have relied on general statements made by the social worker and nurse.

[8] The Jeffreys then initiated the first appeal in this case in *Jeffrey v. Methodist Hosps.*, 956 N.E.2d 151 (Ind. Ct. App. 2011), and argued the trial court erred in granting summary judgment in favor of Methodist Hospital and the doctor. We affirmed the entry of summary judgment in favor of the doctor, but reversed with respect to Methodist Hospital. We concluded a genuine issue of material fact existed as to whether the Jeffreys' request to Methodist Hospital for "any and all . . . information" should have included the sonogram. *Id.* at 155. We further concluded that, with respect to the Jeffreys' claim of negligent misrepresentation, genuine issues of material fact existed as to whether their reliance on the statements by the nurse and social worker was justified. *Id.* at 157.

[9] In January of 2012, the Jeffreys filed their fourth amended complaint with the Indiana Department of Insurance. The Jeffreys alleged Methodist Hospital failed to render reasonable medical care to Ellington, failed to inform the Jeffreys of any abnormal test results, failed to refer Ellington for a neurologic consultation, failed to communicate complete and accurate medical information, and negligently misrepresented Ellington's medical status. As to Ellington, the Jeffreys' complained he suffered damages as a result of Methodist Hospital's allegedly negligent acts; specifically, the complaint alleged Methodist Hospital's failure to inform the Jeffreys of Ellington's test results and failure to provide Ellington with prompt care significantly exacerbated Ellington's

preexisting condition and reduced Ellington's chances of leading an independent life. The Jeffreys also alleged a derivative action as Ellington's parents seeking medical expenses, lost income, emotional injuries, loss of services, loss of consortium, and future lost income and medical expenses. Finally, the Jeffreys alleged, individually, that Methodist Hospital's actions denied them the opportunity to stop the adoption proceedings.

[10] In May of 2012, the Jeffreys and Methodist Hospital settled their dispute. The Release and Settlement Agreement ("Settlement Agreement") states as follows:

> Victor Jeffrey and Lynell Jeffrey, Individually and as the Parents of Ellington Jeffrey, a Minor, (hereinafter referred to collectively as "Claimants"), for the sole consideration documented in this instrument and paid to them as set forth below, do herby discharge and forever release The Methodist Hospitals, Inc., (hereinafter referred to as "Hospital") and its insurers, employees, agents, servants, successors and assigns, from all liabilities, claims for relief, demands, controversies, damages, actions and/or causes of action . . . which are based on or arise from hospital, nursing, healthcare or other services rendered by the Hospital to Claimants at any time in connection with the birth of Ellington Jeffrey on or about February 12, 2006, his subsequent adoption by Victor and Lynell Jeffrey on or about August 25, 2006, and the disclosure at any time of medical records pertaining to Ellington Jeffrey and/or his biological mother in contemplation of the adoption.
>
> * * *
>
> **Payments Due At Time of Settlement**
>
> A cash payment in the amount of $150,000.00, payable to Victor Jeffrey and Lynell Jeffrey, Individually and as Parents of Ellington Jeffrey, a Minor . . . shall be made at the time of settlement.

**Periodic Payments Made According to Schedule**

Periodic payments shall be made to the Ellington Jeffrey Special Needs Trust from an annuity with a present value of $37,001, to be paid as follows:

- $150.00 per month, guaranteed 40 years . . . .
- $8,000.00 payable [in 2024];
- $10,000.00 payable [in 2032]; and
- $10,000.00 payable [in 2043].

* * *

**Other Provisions**

[T]his Release and Settlement Agreement is a full and final compromise of Claimants' disputed medical malpractice claims against Hospital. The payments made pursuant to this instrument are not to be construed as an admission of liability by Hospital. Rather, this compromise is designed to avoid the expense of further litigation between the parties and to terminate all controversies between them which are based in any way upon hospital, nursing, healthcare or other services rendered by Hospital to Claimants at any time in connection with the birth of Ellington Jeffrey on or about February 12, 2006, his subsequent adoption by Victor and Lynell Jeffrey on or about August 25, 2006, and the disclosure at any time of medical records pertaining to Ellington Jeffrey and/or his biological mother in contemplation of the adoption. . . .

The consideration for this Release and Settlement Agreement is not intended as, nor is it understood to be, full compensation to Claimants for their claims against Hospital based on the aforesaid healthcare and services. It is specifically understood and is the intention of the parties that the consideration received pursuant to this instrument shall not in any way prejudice Claimants' right to proceed against the Indiana Patient's Compensation Fund for additional compensation based on such claims. It is understood by the parties that Claimants have always claimed actual damages in excess of $250,000, and they specifically reserve the right to proceed against the Indiana Patient's Compensation Fund for additional compensation.

Appellant's Appendix, Volume 2 at 102-05. Following the settlement, the Jeffreys filed their lawsuit against the Commissioner seeking additional compensation from the Indiana Patient's Compensation Fund.

[11] On November 10, 2016, the Commissioner filed a motion for summary judgment. The Commissioner's motion alleged that (1) Victor and Lynell are not "patients" under the Medical Malpractice Act, and (2) their claim of negligent misrepresentation does not sound in "medical malpractice." The Jeffreys filed their motion in opposition to the Commissioner's motion for summary judgment on January 24, 2017. On March 15, 2017, the trial court approved the Jeffreys' Petition for Approval of Minor's Personal Injury Settlement and Order of Distribution.[3] *See* Appellant's Appendix, Volume 2 at 201-02. The Distribution Order approved the Jeffreys' proposal to place the net amount of the settlement, $81,874.82, into Ellington's Special Needs Trust along with his annuity payments.

[12] On June 7, 2017, the trial court granted the Commissioner's motion for summary judgment. The trial court's summary judgment order stated as follows:

---

[3] The record is unclear why it took five years to approve and disperse the 2012 Settlement Agreement. Additionally, the Commissioner disputes whether the petition is a proper part of the record. The record on appeal "consist[s] of the Clerk's Record and all proceedings before the trial court . . . ." Ind. Appellate Rule 27. The "Clerk's Record" is the record maintained by the clerk of the court and "consist[s] of the Chronological Case Summary (CCS) and all papers, pleadings, documents, orders, judgments, or other materials filed in the trial court . . . ." App. R. 2(E). Thus, the petition is a proper part of the record on appeal.

There is no dispute that the [$37,001] paid to Ellington was paid as a result of the resolution of a claim for medical malpractice.[4] There is also no dispute that this amount is insufficient to allow the case to proceed to the [Patient's Compensation] Fund. The issue then becomes: if there is a material question of fact that the $150,000 paid to Victor and Lynell was the result of the resolution of a claim for medical malpractice . . . .

* * *

IC 34-18-2-18 provides as follows:

"Malpractice" means a tort or breach of contract based on health care or professional services that were provided, or that should have been provided, by a health care provider, to a patient.

Does the failure of the social worker to disclose Ellington's condition to Victor and Lynell fit the statutory definition of malpractice? A case which is particularly instructive in answering this question is *H.D. v. BHC Meadows Hosp., Inc.*, 884 N.E.2d 849 (Ind. Ct. App. 2008). There, a family had their daughter admitted to a hospital for psychiatric treatment. The parents and hospital signed a confidentiality agreement stating that information would not be shared with the daughter's school or school counselor. However, her therapist at the hospital, unaware of the agreement, sent a fax to the school counselor indicating that the daughter was being treated for depression. . . . The trial court dismissed [the plaintiffs' complaint] upon finding that it lacked subject matter jurisdiction because the claims had not first been submitted to a medical review panel. The Court of Appeals reversed, finding that the family's claims were ordinary negligence claims . . . and that the average juror could review them just as well as a medical review panel:

---

[4] Although the trial court's summary judgment order declares there is no dispute, the Commissioner states he "does not concede that Ellington Jeffrey's claim constitutes medical malpractice . . . but did not raise the issue at the trial court since the failure of the Jeffreys' individual claims was a threshold issue . . . ." Brief of Appellee at 14 n.6.

The text of the [Medical Malpractice] Act itself thus leads one to conclude that the General Assembly intended to exclude from the legislation's purview conduct of a provider unrelated to the promotion of a patient's health or the provider's exercise of professional expertise, skill or judgment . . . [t]he legislature's establishment of a medical review panel, the sole purpose of which is to provide an expert determination on the question of whether a provider complied with the appropriate standard of care, suggests that the scope of the Act is likewise confined to actions premised upon the exercise of profession [sic] judgment. Moreover, we have repeatedly held that when plaintiffs articulate claims for ordinary negligence, unrelated to the provision of medical care or treatment, those claims do not fall within the scope of the Medical Malpractice Act. We fail to see why the therapist's act of faxing a patient's confidential information to a fax machine located in a school office without taking precautions to ensure that the materials are discreetly received by the intended recipient would necessitate consideration by a medical review panel, 884 N.E.2d at 855, *citations omitted*.

Here, the Court cannot see why the social worker's act, intentional or not, of failing to release full and complete medical records regarding Ellington, or Methodist's failure to have a medical record filing and retrieval system that would have assured that Victor and Lynell would have known of Ellington's condition, would necessitate consideration by a medical review panel.

The language of the release document signed by Victor and Lynell and Methodist clearly sets forth their intent that the settlement meet the statutory minimum and allow Victor and Lynell to proceed against the [Patient's Compensation] Fund. However, the designated materials demonstrate no material issue of fact that the [Patient's Compensation] Fund was not a party to the release document, and that the $150,000 paid to Victor and Lynell was made in compensation for Methodist failing to inform them of the results of the sonogram taken before Ellington's birth, a breach of duty not encompassed by the Medical Malpractice Act.

Appealed Order at 3-7. The Jeffreys now appeal.

# Discussion and Decision

## I. Standard of Review

In reviewing a summary judgment order, we apply the same standard as the trial court. *City of Lawrence Util. Serv. Bd. v. Curry*, 68 N.E.3d 581, 585 (Ind. 2017). Summary judgment is appropriate only when "the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Ind. Trial Rule 56(C). An issue is "genuine" if a trier of fact is required to resolve the truth of the matter; a fact is "material" if its resolution affects the outcome of the case. *Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014).

Summary judgment is a "blunt instrument" by which the non-prevailing party is prevented from resolving its case at trial. *Id.* Because of this, our supreme court has cautioned that summary judgment "is not a summary trial" and courts on appeal should carefully "assess the trial court's decision to ensure [a party] was not improperly denied [their] day in court." *Id.* at 1003-04 (citations omitted). In other words, "Indiana consciously errs on the side of letting marginal cases proceed to trial on the merits, rather than risk short-circuiting meritorious claims." *Id.* at 1004.

## II. Summary Judgment

[15] Indiana's Medical Malpractice Act caps a claimant's recoverable damages at $1,250,000. Ind. Code § 34-18-14-3(a)(3). Of that $1,250,000, a healthcare provider or its insurer is only liable for $250,000. Ind. Code § 34-18-14-3(b)(1).[5] Any amount of damages in excess of the healthcare provider or insurer's liability shall be paid from the Indiana Patient's Compensation Fund. Ind. Code § 34-18-14-3(c). If a healthcare provider or its insurer agrees to settle its liability by paying its policy limits and the claimant is demanding a sum greater than the policy limit, then the procedure outlined by the statute must be followed in order to recover from the Patient's Compensation Fund. Ind. Code § 34-18-15-3.

[16] To fall within the MMA, a patient must have suffered from an act of medical "malpractice." The MMA defines "malpractice" as a "tort or breach of contract based on health care or professional services that were provided, or that should have been provided, by a health care provider, to a patient." Ind. Code § 34-18-2-18. "Health care" means an "act or treatment performed or furnished, or that should have been performed or furnished, by a health care provider for, to, or on behalf of a patient during the patient's medical care,

---

[5] These stated recovery limitations existed for an act of malpractice that occurred between June 30, 1999 and July 1, 2017. For an act of malpractice occurring between June 30, 2017 and July 1, 2019, a claimant's total recoverable damages are $1,650,000; a healthcare provider or insurer is only liable for $400,000. Ind. Code § 34-18-14-3(a)(4), (b)(2).

treatment, or confinement." Ind. Code § 34-18-2-13. A "patient" is defined as an

> individual who receives or should have received health care from a health care provider, under a contract, express or implied, and includes a person having a claim of any kind, whether derivative or otherwise, as a result of alleged malpractice on the part of a health care provider. Derivative claims include the claim of a parent or parents, guardian, trustee, child, relative, attorney, or any other representative of the patient including claims for loss of services, loss of consortium, expenses, and other similar claims.

Ind. Code § 34-18-2-22. A "representative" means "the spouse, parent, guardian, trustee, attorney, or other legal agent of the patient." Ind. Code § 34-18-2-25.

[17] The Commissioner's motion for summary judgment and his brief on appeal argue certain conditions precedent to recovery must be met in order to seek additional compensation from the Patient's Compensation Fund. Those conditions precedent are (1) a settlement agreement in the amount of $250,000 from a qualified healthcare provider[6]; (2) the claimant must be a "patient"; and (3) the claim must be for one of medical "malpractice." The trial court, agreeing with the Commissioner, determined the $150,000 cash payment made to the Jeffreys was compensation for Methodist Hospital's failure to inform the

---

[6] In the case of a structured settlement, the threshold amount can be met with if "the sum of the present payment of money to the patient (or the patient's estate) by the health care provider (or the health care provider's insurer) plus the cost of the periodic payments agreement expended by the health care provider (or the health care provider's insurer)" exceeds $187,000. Ind. Code § 34-18-14-4(b).

Jeffreys of the result of the sonogram—a breach of duty the trial court determined was outside the scope of the MMA. Because the trial court concluded the $150,000 cash payment to the Jeffreys was not for claims of "malpractice," the Jeffreys could not aggregate the $150,000 cash payment with the value of Ellington's annuity to reach the statutory minimum necessary to pursue additional compensation. Essentially, the trial court concluded there was no genuine issue of material fact as to whether the Jeffreys met the minimum threshold necessary to seek additional compensation from the Patient's Compensation Fund.

[18] As noted, the Jeffreys' proposed complaint alleged, on behalf of Ellington, that Methodist Hospital failed to render reasonable medical care to Ellington, failed to inform the Jeffreys of any abnormal test results, failed to refer Ellington for a neurologic consultation, failed to communicate complete and accurate medical information, and negligently misrepresented Ellington's medical status. Their complaint alleged that as a result of these failures, Ellington suffered a direct harm to his health. The Jeffreys, derivatively as Ellington's parents, alleged they suffered emotional damages, medical expenses, and lost income. Finally, the Jeffreys, in a separate count, alleged they lost the opportunity to stop the adoption proceedings.

[19] The Jeffreys' settlement of these claims with Methodist Hospital included two separate payments, an annuity with a present value of $37,001 (total value of $100,000) payable to the Ellington Jeffrey Special Needs Trust, and a cash payment of $150,000 payable to Victor and Lynell Jeffrey, "Individually and as

Parents of Ellington Jeffrey[.]" Appellant's App., Vol. 2 at 102. The Commissioner contends because the Settlement Agreement includes the Jeffreys' claims of wrongful adoption and negligent misrepresentation—claims he alleges are not "malpractice," the $150,000 cash payment cannot be aggregated by the Jeffreys to meet the statutory minimum to seek additional compensation from the Patient's Compensation Fund. We disagree with the Commissioner.

[20] The Jeffreys and Methodist Hospital's Settlement Agreement states it constitutes a "full and final compromise of Claimants' disputed medical malpractice claims against the Hospital . . . [but] is not intended as, nor is it understood to be, full compensation to Claimants . . . [as] they specifically reserve the right to proceed against the Indiana Patient's Compensation Fund[.]" Appellant's App., Vol. 2 at 103-04. It further states that Methodist Hospital compensated the Jeffreys, not as an admission of liability, but to "avoid the expense of further litigation between the parties and to terminate all controversies between them which are based in any way upon" services provided to the Jeffreys by Methodist Hospital in connection with Ellington's birth. *Id.*

[21] A fair reading of the Settlement Agreement indicates the Jeffreys and Methodist Hospital intended to resolve all claims, including those sounding in medical malpractice, in a single settlement, as parties often do, and that the Jeffreys always intended to seek further compensation from the Patient's Compensation Fund. At this point, Ellington has alleged, through his parents, that he suffered

damages as a result of medical care that should have been provided by Methodist Hospital. In return for a release of all claims, Methodist Hospital purchased an annuity with a total value of $100,000 payable to the Ellington Jeffrey Special Needs Trust over a period of forty years. The Jeffreys, derivatively of Ellington's claims of malpractice, alleged they suffered emotional damages, medical expenses, and lost income. *See, e.g., Ind. Patient's Comp. Fund v. Wolfe*, 735 N.E.2d 1187, 1193 (Ind. Ct. App. 2000) (holding parents with a derivative claim are not entitled to a separate damages cap; rather, their claims are included within the patient's claim), *trans. denied*. Although the Jeffreys' claims also include a claim of wrongful adoption and negligent misrepresentation, which the Commissioner alleges are not claims of "malpractice," the Settlement Agreement does nothing to carve out which part, if any, of the $150,000 cash payment was allocated to the Jeffreys' derivative claims and which part, if any, was allocated to the Jeffreys' remaining claims. A "terminat[ion of] all controversies" does not necessarily mean a payment for each of those specific claims. Appellant's App., Vol. 2 at 103-04. The Jeffreys may have intended the entire $150,000 be allocated to their derivative claim, as the trial court's March 15, 2017, Distribution Order placing the net proceeds from the $150,000 payment into the Ellington's Special Needs Trust suggests, or they may have intended none of it to be allocated for that purpose; regardless, that is an issue for trial. In short, a genuine issue of material fact exists as to whether the Jeffreys have met the statutory minimum of a healthcare provider's or insurer's liability necessary to seek additional compensation from the Patient's Compensation Fund.

[22]     Moreover, the Commissioner is not prejudiced by this resolution as he may continue to litigate the issue of damages at trial, rather than asking this court to resolve issues that are unclear from the record. In this sense, the issue is similar to that of excess claims to a general insurance policy, and we look to *State Farm Fire & Cas. Co. v. T.B. ex rel. Bruce*, 762 N.E.2d 1227 (Ind. 2002), for guidance. In *State Farm*, the insured operated a day care center. Thereafter, the insured's husband molested one of the children at the day care center and was subsequently convicted of child molesting. The child then sued the insured and her husband claiming negligence and premises liability. The insured had a homeowner's policy issued by State Farm; however, the homeowner's policy specifically excluded negligence relating to child care services. State Farm received notice of the suit but denied coverage and refused to defend the insured. The plaintiff and insured eventually entered into a consent judgment for $375,000, in addition to the insured assigning all rights, interests and remedies against State Farm arising from their homeowner's policy to the plaintiff. The consent judgment also included language that tended to separate the molestation from any childcare activities undertaken by the insured. The trial court accepted the consent judgment and later granted summary judgment in favor of the plaintiff in proceedings supplemental against State Farm.

[23]     On appeal, State Farm argued collateral estoppel did not bar it from raising a policy exclusion defense and that it should not be bound by the factual statements in the consent judgment that were not "necessary" to resolving the underlying lawsuit. *Id.* at 1230. State Farm conceded that it was collaterally

estopped from disputing that the insureds were negligent, but sought to challenge certain factual statements in the consent judgment on the ground that those findings were not necessary elements of the consent judgment. State Farm argued that the underlying plaintiff had characterized events with the "obvious intent" of bringing the consent judgment within the policy's coverage. *Id.* at 1231.

[24] Our supreme court agreed that the characterizations were "unnecessary to sustain [the] complaint for damages regarding negligence" and that their "sole purpose" was to assure the claims fall within coverage. *Id.* The court held that, if an insurer has notice of the factual determinations that will be made to resolve a lawsuit, the insurer's failure to participate in the lawsuit "will bind it to those determinations," but an insurer cannot be estopped from contesting unnecessary matters resolved in the underlying litigation. *Id.* at 1232. Thus, because the underlying plaintiff's claim did not specifically address State Farm's contractual obligations under the policy—even though the consent judgment did—collateral estoppel did not bar State Farm from challenging certain factual statements in the consent judgment.

[25] In sum, because the underlying lawsuit alleged negligence, State Farm was estopped from challenging findings relating to negligence. However, State Farm was not estopped from challenging factual statements in the consent judgment that were not necessary to the case's resolution. Therefore, it could challenge the factual determinations in the consent judgment establishing that

the child's injury was unrelated to any daycare activities and summary judgment was inappropriate.

[26] Here, the Jeffreys are seeking additional compensation from the Patient's Compensation Fund and have alleged damages exceeding $250,000. In the Settlement Agreement, the Jeffreys stated their intention to pursue additional damages from the Patient's Compensation Fund and included language reserving their right to do so. However, similar to State Farm's ability to challenge the consent agreement, the Commissioner, who is not in any way bound by the Settlement Agreement, may still challenge at trial whether the Jeffreys have met the statutory prerequisites necessary to seek additional compensation from the Patient's Compensation Fund. While it may be possible for the Commissioner to demonstrate some of the $150,000 cash payment was for non-medical claims, it is also possible, given the language in the Settlement Agreement, that none was to be so allocated. However, at this stage in the litigation, the record is undeveloped regarding how the Jeffreys allocated the cash payment with respect to each of their claims and we decline the Commissioner's invitation to speculate on this issue thereby denying the Jeffreys their day in court.

[27] Finally, from a public policy standpoint, our resolution is consistent with Indiana's general policy of encouraging parties to negotiate and settle their disputes. *Mendenhall v. Skinner and Broadbent Co., Inc.*, 728 N.E.2d 140, 145 (Ind. 2000) (noting the policy of the law is to discourage litigation and encourage negotiation and settlement of disputes). If we were to accept the

Commissioner's argument that any medical malpractice settlement agreement containing an additional claim that does not qualify as "malpractice" automatically denies access to the Patient's Compensation Fund, we would discourage the settlement of an entire transaction in one single act and incentivize the piecemeal settlement of multiple claims. It seems vastly more efficient to settle an entire transaction in one settlement agreement rather than require parties to settle their disputes claim by claim. This is especially true given the fact the Commissioner may still prove at trial that the Jeffreys' claims do not sound in "malpractice" or that the damages do not meet the statutory amount required for access to the Patient's Compensation Fund.

# Conclusion

[28]     A genuine issue of material fact exists as to whether the Jeffreys have met the statutory minimum amount necessary to seek additional compensation from the Patient's Compensation Fund and the trial court improvidently entered summary judgment in favor of the Commissioner. Accordingly, we reverse the trial court's summary judgment order and remand for further proceedings.

[29]     Reversed and remanded.

Crone, J., and Bradford, J., concur.